**Nos. 19-4123 (L), 19-4160, 19-4180, 19-4181,
19-4328, 19-4808, 19-4562, 19-4727**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**UNITED STATES OF AMERICA,**

**Appellee,**

**v.**

**MONTANA BARRONETTE, ET AL.,**

**Appellants.**

*Appeal from the United States District Court for the
District of Maryland, Northern Division
The Honorable Catherine C. Blake, U.S. District Judge*

### RESPONSE BRIEF OF APPELLEE
### UNITED STATES OF AMERICA

**Jonathan F. Lenzner
Acting United States Attorney**

**Jason D. Medinger
Assistant United States Attorney
36 S. Charles Street, 4th Floor
Baltimore, Maryland 21201
410-209-4800**

**September 17, 2021**          *Attorneys for the Appellee*

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION.................................................................................1

STATEMENT OF THE ISSUES.................................................................................1

STATEMENT OF THE CASE.................................................................................3

SUMMARY OF ARGUMENT .................................................................13

ARGUMENT .................................................................13

I.   The Count One RICO Conspiracy Charge Was Valid.......................................13

II.   The Tracking Orders And Wiretaps Were Supported By Ample Probable Cause
.................................................................................17

III.   Sivell's Post-Arrest Statements Were Admissible .........................................28

IV.   The District Court Properly Exercised Its Discretion In Controlling Access To
The Courtroom To Address Security Concerns.......................................................32

V.   The Government Adduced More Than Sufficient Evidence On The Interstate
Commerce Element In Count One.....................................................................42

VI.   The Felon In Possession Convictions Of Pulley And Wilson Must Be Affirmed
.................................................................................46

VII.   Ample Evidence Supported Wilson's Conviction Under § 924(c)................49

VIII. The District Court Properly Admitted The Grand Jury Testimony Of Markee
Brown.................................................................................54

IX. The District Court Properly Exercised Its Discretion By Denying
Defendants' Motion For Mistrial Because Bond's Testimony Caused No Prejudice
.................................................................................63

i

`

X.    More Than Sufficient Evidence Established The Drug Weight Found By The Jury ...................................................................................................................67

XI.    More Than Sufficient Evidence Showed That Sivells and Floyd Conspired to Murder Antonio Addison ..................................................................................70

XII.   More Than Sufficient Evidence Supported The Jury's Finding That Broughton    Conspired    To    Murder    Someone    In    January    2016 ...........................................................................................................................73

XIII.    Sivells' Life Sentence Was Procedurally And Substantively Reasonable ...76

XIV.    The District Court Properly Sentenced Broughton .......................................81

XV.    The District Court Properly Sentenced Floyd ..............................................85

CONCLUSION ..................................................................................................85

STATEMENT REGARDING ORAL ARGUMENT ...........................................86

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

`

# TABLE OF AUTHORITIES

## CASES

*Apprendi v. New Jersey*, 530 U.S. 466 (2000)..........................................................67

*Arizona v. Fulminante*, 499 U.S. 279 (1991)...........................................................32

*Bell v. Evatt*, 72 F.3d 421 (4th Cir. 1995)................................................................36

*Bell v. Jarvis*, 236 F.3d 149 (4th Cir. 2000) ...........................................................36

*Burks v. United States*, 437 U.S. 1 (1978) ..............................................................43

*Connally v. General Constr. Co.*, 269 U.S. 385 (1926) ..........................................14

*Davis v. United States*, 139 S. Ct. 2319 (2019) ......................................................16

*Davis v. United States*, 564 U.S. 229 (2011) ..........................................................19

*Davis v. United States*, 512 U.S. 452 (1994) ..........................................................29

*Davis v. Washington*, 547 U.S. 813 (2006) .............................................................59

*Deck v. Missouri*, 544 U.S. 622 (2005) ...................................................................40

*Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46 (1989) .........................................15

*Gall v. United States*, 552 U.S. 38 (2007) ..............................................................76

*Gannett Co. v. DePasquale*, 443 U.S. 368 (1979)...................................................35

*Gibbs v. Babbitt*, 214 F.3d 483 (4th Cir. 2000) ......................................................44

*Giles v. California*, 554 U.S. 353 (2008).................................................................59

*Gonzales v. Raich*, 545 U.S. 1 (2005).....................................................................45

*Greer v. United States*, 141 S. Ct. 2090 (2021)................................................. 46, 47

*H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989) ......................15

iii

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .......................................14

*Illinois v. Allen*, 397 U.S. 337 (1970) ....................................................................39

*Johnson v. United States*, 135 S. Ct. 2551 (2015) ................................................16

*McMellon v. United States*, 387 F.3d 329 (4th Cir. 2004).....................................16

*McNeil v. Wisconsin*, 501 U.S. 171 (1991)............................................................30

*Miranda v. Arizona*, 384 U.S. 436 (1966) ....................................................... 29, 30

*Pinkerton v. United States*, 328 U.S. 640 (1946)...................................................62

*Rehaif v. United States*, 139 S. Ct. 2191 (2019) .............................................. 46, 47

*Richmond Newspapers v. Va.*, 448 U.S. 555 (1980)................................... 35, 37, 39

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018)..........................................................16

*Snyder v. Coiner*, 510 F.2d 224 (4th Cir. 1975) ....................................................37

*United States v. Adepoju*, 756 F.3d 250 (4th Cir. 2014)..........................................42

*United States v. Apple*, 915 F.2d 899 (4th Cir. 1990)............................................26

*United States v. Atkinson*, 815 Fed. Appx. 704 (4th Cir. 2020) ....................... 82, 83

*United States v. Argueta*, 470 Fed. Appx. 176 (4th Cir. 2012) ..............................44

*United States v. Bazemore*, 2020 WL 5653364 (D. Md. Sept. 23, 2020)...............17

*United States v. Bennett*, 984 F.2d 597 (4th Cir. 1993)..........................................15

*United States v. Beidler*, 110 F.3d 1064 (4th Cir. 1997) ............................ 42, 67, 70

*United States v. Borromeo*, 954 F.2d 245 (4th Cir. 1992)......................................15

*United States v. Burgos*, 94 F.3d 849 (4th Cir. 1996) ...........................................68

*United States v. Caldwell*, 2021 U.S. App. LEXIS 23202 (4th Cir. Aug. 3, 2021) ............................................................................................................48

iv

`

*United States v. Carson*, 455 F.3d 336 (D.C. Cir. 2006)...........................................62

*United States v. Carter*, 564 F.3d 325 (4th Cir. 2009) .............................................77

*United States v. Cervantes*, 706 F.3d 603 (5th Cir. 2013)........................................37

*United States v. Cornell*, 780 F.3d 616 (4th Cir. 2015).............................. 43, 44, 45

*United States v. Cox*, 744 F.3d 305 (4th Cir. 2014)..................................................76

*United States v. Davis*, 139 S. Ct. 2319 (2019) ......................................................16

*United States v. DePew*, 932 F.2d 324 (4th Cir. 1991) ...........................................18

*United States v. Dinkins*, 691 F.3d 358 (4th Cir. 2012).................................... 58, 59

*United States v. Diosdada Star*, 650 F.3d 359 (4th Cir. 2011)................................76

*United States v. Dolorius*, 107 F.3d 248 (4th Cir. 1997).........................................64

*United States v. Fall*, 955 F.3d 363 (4th Cir. 2020) ......................................... 26, 27

*United States v. Gibbs*, 897 F.3d 199 (4th Cir. 2018) .............................................77

*United States v. Gary*, 528 F.3d 324 (4th Cir. 2008)...............................................19

*United States v. Gray*, 137 F.3d 765 (4th Cir. 1998)...............................................43

*United States v. Gutierrez*, 963 F.3d 320 (4th Cir. 2020)........................................45

*United States v. Hashime*, 734 F.3d 278 (4th Cir. 2013).........................................28

*United States v. Hernandez*, 603 F.3d 267 (4th Cir. 2010) .....................................77

*United States v. Hickman*, 626 F.3d 756 (4th Cir. 2010).........................................68

*United States v. Howard*, 773 F.3d 519 (4th Cir. 2014).........................................51

*United States v. Jaensch*, 665 F.3d 83 (4th Cir. 2011) ...........................................17

*United States v. Jeffers*, 570 F.3d 557, 565-66 (4th Cir. 2009)......................... 51, 53

v

*United States v. Johnson*, 825 Fed. Appx. 156 (5th Cir. 2020) ...............................16

*United States v. Johnson*, 587 F.3d 625 (4th Cir. 2009)..........................................77

*United States v. Johnson*, 400 F.3d 187 (4th Cir. 2005)..........................................32

*United States v. Kelly*, 592 F.3d 586 (4th Cir. 2010)...............................................18

*United States v. King*, 628 F.3d 693 (4th Cir. 2011) ...............................................51

*United States v. Leon*, 468 U.S. 897 (1984) ...........................................................19

*United States v. Lomax*, 293 F.3d 701 (4th Cir. 2002) ............................................50

*United States v. Mathis*, 932 F.3d 242 (4th Cir. 2019)...........................................42

*United States v. Medley*, 972 F.3d 399 (4th Cir. 2020) ...........................................47

*United States v. Mendoza-Mendoza*, 597 F.3d 212 (4th Cir. 2010) ........................78

*United States v. Miller*, 809 Fed. Appx. 131 (4th Cir. 2020) ..................................19

*United States v. Moore*, 769 F.3d 264 (4th Cir. 2014) ............................................50

*United States v. Mouzone*, 687 F.3d 207 (4th Cir. 2012) ........................................63

*United States v. Neal*, 78 F.3d 901 (4th Cir. 1996) .................................................66

*United States v. Nesbitt*, 464 Fed. Appx. 89 (4th Cir. 2012)...................................77

*United States v. Osborne*, 68 F.3d 94 (5th Cir. 1995) .............................................35

*United States v. Promise*, 255 F.3d 150 (4th Cir. 2001)..........................................68

*United States v. Rivera*, 292 F. Supp. 2d 827 (E.D. Va. 2003) ...............................60

*United States v. Robertson*, 514 U.S. 669 (1995).....................................................45

*United States v. Robinson*, 855 F.3d 265 (4th Cir. 2017)........................................42

vi

*United States v. Ross*, 912 F.3d 740 (4th Cir. 2019) ................................77

*United States v. Savage*, 885 F.3d 212 (4th Cir. 2018) ............................42

*United States v. Savillon-Matute*, 636 F.3d 119 (4th Cir. 2011) .............87

*United States v. Shryock*, 342 F.3d 948 (9th Cir. 2003) ..........................37

*United States v. Slade*, 631 F.3d 185 (4th Cir. 2011) ...............................82

*United States v. Slappy*, 872 F.3d 202 (4th Cir. 2017) .............................78

*United States v. Strayhorn*, 743 F.3d 917 (4th Cir. 2014) .......................51

*United States v. Talbert*, 706 F.2d 464 (4th Cir. 1983) ............................18

*United States v. Taylor*, 136 S. Ct. 2074 (2016)......................................44

*United States v. Taylor*, 942 F.3d 205 (4th Cir. 2019) .............................64

*United States v. Thompson*, 286 F.3d 950 (7th Cir. 2002) .......................62

*United States v. Wallace*, 515 F.3d 327 (4th Cir. 2008)...........................65

*United States v. White*, 850 F.3d 667 (4th Cir. 2017)...............................77

*United States v. Williams*, 364 F.3d 556 (4th Cir. 2004)..........................14

*United States v. Williams*, 974 F.3d 320 (3rd Cir. 2020).........................35

*United States v. Wilson*, 115 F.3d 1185 (4th Cir. 1997)...........................73

*United States v. Zelaya*, 908 F.3d 920 (4th Cir. 2018) .............................43

*Waller v. Georgia*, 467 U.S. 39 (1984)....................................................36

*Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017) ...................................38

*Woodson v. Hutchinson*, 52 Fed. Appx. 195 (4th Cir. 2002) ...................37

vii

## STATUTES

18 U.S.C. § 922(g) ...................................................................................4

18 U.S.C. § 924(c)(1)(A) ..........................................................................4

18 U.S.C. § 1959 ......................................................................................4

18 U.S.C. § 1962(d) .................................................................................4

18 U.S.C. § 3231 ......................................................................................1

18 U.S.C. § 3742 ......................................................................................1

21 U.S.C. § 841 ........................................................................................4

21 U.S.C. § 846 ........................................................................................4

28 U.S.C. § 1291 ......................................................................................1

## RULES

Fed. R. Evid. 804(b)(6) ..........................................................................57

`

## JURISDICTIONAL STATEMENT

The defendants were charged in a second superseding indictment for their conduct as part of a murderous gang of drug dealers that called itself "Trained To Go" or "TTG."   JA 741-56.   The district court had jurisdiction over this criminal matter pursuant to 18 U.S.C. § 3231.   The defendants were convicted following trial and sentenced.   JA 3393-3416 (Verdict Form); JA 3418 (Barronette), 3425 (Wilson), 3462 (Broughton), 3468 (Harrison), 3524 (Sivells), 3531 (Tillman), 3554 (Floyd), 3590 (Pulley).

The defendants timely appealed.   JA 3417 (Barronette), 3424 (Wilson), 3474 (Harrison), 3475 (Broughton), 3530 (Sivells), 3537 (Tillman), 3560 (Floyd), 3597 (Pulley).   This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## STATEMENT OF THE ISSUES

1.   Whether the district court properly applied Circuit precedent (*United States v. Bennett*, 984 F.2d 597, 605-07 (4th Cir. 1993)) and held that the Count One RICO conspiracy charge was not unconstitutionally vague.

2.   Whether the issuing judge had a substantial basis to conclude that probable cause supported the tracking orders, wiretaps, and search warrants in this case.

`

3. Whether Sivell's post-arrest statements were admissible where he was read his *Miranda* rights and voluntarily spoke with law enforcement.

4. Whether the district court properly addressed a security concern by limiting the number of people in the gallery and allowing any overflow to listen to proceedings in a separate courtroom.

5. Whether sufficient evidence supported the jury's finding on the interstate commerce element in Count One.

6. Whether the felon in possession convictions of Pulley and Wilson must be affirmed based on recent Supreme Court precedent.

7. Whether sufficient evidence supported Wilson's conviction under § 924(c).

8. Whether the district court properly exercised its discretion in admitting the testimony of Markee Brown, who was killed by this gang before he could testify against one of them.

9. Whether the district court properly exercised its discretion in denying the motion for a mistrial based on a single comment by a witness elicited on cross by defense counsel.

10. Whether sufficient evidence supported the jury's finding as to the drug weight associated with this conspiracy.

2

11.   Whether sufficient evidence showed Sivells and Floyd conspired to murder Antonio Addison.

12.   Whether sufficient evidence supported the jury's finding that Broughton conspired to murder someone in January 2016.

13.   Whether Sivells' life sentence was procedurally and substantively reasonable.

14.   Whether the district court properly sentenced Broughton.

15.   Whether the district court properly sentenced Floyd.

## STATEMENT OF THE CASE

## 1.  Procedural History

On June 7, 2018, a federal grand jury returned a second superseding indictment charging the defendants with numerous crimes.   JA 735-61 (ECF 296). Specifically:

(1) Count 1 charged Montana Barronette, Terrell Sivells, John Harrison, Taurus Tillman, Linton Broughton, Dennis Pulley, Roger Taylor, Brandon Wilson, Brandon Bazemore, and Timothy Floyd with conspiracy to engage in racketeering activities, in violation of 18 U.S.C. § 1962(d);

(2) Count 2 charged Barronette, Harrison, Bazemore, and Taylor with violence in aid of racketeering activities, to wit, the murders of LR, GT, and JP, in

3

violation of 18 U.S.C. § 1959;

(3) Count 3 charged Barronette, Sivells, Harrison, Tillman, Broughton, Pulley, Taylor, Wilson, Bazemore, and Floyd with conspiracy to distribute more than a kilogram of heroin, as well as cocaine and marijuana, in violation of 21 U.S.C. § 846;

(4) Count 4 charged Sivells with possession with intent to distribute heroin on August 11, 2016, in violation of 21 U.S.C. § 841;

(5) Count 5 charged Tillman with possession with intent to distribute heroin on October 31, 2016, in violation of 21 U.S.C. § 841;

(6) Count 6 charged Tillman with possession with intent to distribute heroin on November 2, 2016, in violation of 21 U.S.C. § 841;

(7) Count 7 charged Wilson with possession of a firearm in furtherance of a drug trafficking crime on January 10, 2017, in violation of 18 U.S.C. § 924(c)(1)(A);

(8) Count 8 charged Wilson with possession of a firearm by a convicted felon on January 10, 2017, in violation of 18 U.S.C. § 922(g);

(9) Count 9 charged Pulley with possession of a firearm in furtherance of a drug trafficking crime on January 12, 2017, in violation of 18 U.S.C. § 924(c)(1)(A); and

4

(10) Count 10 charged Pulley with possession of a firearm by a convicted felon on January 12, 2017, in violation of 18 U.S.C. § 922(g). *Id.*

Following a 25-day trial, the defendants were convicted by a jury on all charges.   JA 3393.

The defendants were subsequently sentenced and filed timely notices of appeal.   JA 3417-3597.

## 2.    Factual Background

In or before 2010, defendant Montana Barronette, along with other co-defendants, operated a drug trafficking organization (the "Enterprise" or "TTG") in and around the Sandtown neighborhood of west Baltimore, Maryland.   JA 3684. The organization distributed heroin, cocaine, marijuana, and other controlled substances.   JA 3684.   In addition to distributing drugs, the organization engaged in acts of violence, including murder, kidnapping, and assault, to protect and expand the Enterprise's criminal operations and intimidate rival gang members, rival drug dealers, and individuals cooperating with law enforcement.   *Id.*   Other criminal organizations, including a group known as "Young Go Getters" ("YGG"), solicited members and associates of the Enterprise to engage in murder-for-hire schemes.   *Id.*   As of in or about 2014, the organization became known as

5

`

"Trained To Go" or "TTG."  *Id.*   Barronette and co-defendant Terrell Sivells

served as the leadership for TTG starting in 2010.   JA 3758.

### 1.    Drug-Dealing

Members of TTG, at Barronette's and Sivells' direction, routinely sold

"packs" of heroin and gram quantities of marijuana.  *Id.*   Typically, a "pack"

contained between 25 and 50 gel capsules of heroin, or approximately two and a

half to five grams.  *Id.*

Co-defendants and co-conspirators routinely communicated with Barronette

and Sivells to coordinate the distribution of drugs.   JA 3761, 3707.   For example,

on January 22, 2016, Broughton informed Barronette that he still had two packs of

heroin left to sell ("I got 2 25's still").   JA 3707.   On March 5, 2016, Sivells

contacted Floyd and asked him what type/quantity of drugs Floyd needed for resale

("What you tryna get").   JA 3761.   Floyd responded that he only needed a "half,"

referring to a half ounce of marijuana.  *Id.*   On March 30, 2016, an unknown male

contacted Sivells to arrange a drug transaction at Mondawmin Mall.  *Id.*   During

the conversation, Sivells stated that he had "Diesel," but the unknown male wanted

"Haze," which are common references to types of marijuana.  *Id.*   On March 31,

2016, Pulley contacted Sivells to arrange a drug transaction, asking Sivells to bring

him seven grams of marijuana (referred to as a "Vick").  *Id.*   On April 8, 2016,

6

`

Barronette talked to Broughton while he was in jail and informed him that Broughton's replacement was selling less than 18 packs and that Broughton would be returned to his place when he was released.   JA 3707.   On May 12, 2016, Floyd contacted Sivells to warn him that law enforcement officers were conducting surveillance in the area.   JA 3761.

In addition to wiretap calls, physical surveillance also showed the defendants dealing drugs.   For example, on April 8, 2016, law enforcement officers conducted surveillance of 1315 Harlem Avenue, a known stash location for TTG. JA 3761.   During the course of the surveillance, officers observed Barronette and Sivells meeting with customers, conducting transactions, and moving in and out of the residence at 1315 Harlem.   *Id.*   Later in the day, officers conducted a search of 1315 Harlem and located approximately a pound of marijuana and a 9mm handgun.   *Id.*; *see also* SJA 114-21 (describing defendants engaged in drug dealing and their use of the Harlem address).

Furthermore, law enforcement conducted controlled purchases of drugs from the group.   For example, on August 4, 2016, law enforcement officers utilized a confidential source ("CS") to purchase heroin from Sivells.   Sivells communicated directly with the CS, met with him, and provided the CS with a pack of gel caps, which contained approximately 5 grams of heroin, all of which was video-recorded

7

by the CS.   JA 3761.   On August 11, 2016, the CS again contacted Sivells to buy

heroin; Sivells then directed the CS to an associate who supplied the CS with four

packs of 25 gelcaps, which amounted to approximately 25 grams of heroin.   *Id.*

On September 1, 2016, the CS again met with Sivells.   *Id.*   During the meeting,

Sivells discussed how to package and process heroin and how Sivells made $6,000

in drug sales in one week and that Barronette made $50,000 in a two-week period.

*Id.*

In its verdict, the jury found the defendants responsible for trafficking more

than a kilogram of heroin, as well as cocaine and marijuana.   JA 3402-09.

## 2.   Murders

Additionally, the jury found various combinations of the defendants guilty of

conspiring to murder the following individuals: (1) Brian Chase on January 4,

2015; (2) Marquez Jones on March 2, 2015; (3) Lamont Randall, Gerald

Thompson, and Jacqueline Parker on July 7, 2015; (4) Dominique Harris on

December 28, 2015; (5) an unknown individual on January 22, 2016; (6) Antonio

Addison on May 25, 2016; and (7) Christopher Pennington on January 9, 2017.

JA 3393-3401.   The government describes herein the facts related to some of these

murders for context.

In early 2015, Harrison killed Brian Chase.   *See* JA 1848-60, 2729-30.

8

Harrison believed that a rival gang had put a contract out to kill Harrison for $20,000.  SJA 23; SJA 130.  Harrison believed that Brian Chase was discussing the contract.  Fearing that Chase would spur someone into killing him and collecting the $20,000, Harrison decided to kill Chase.  JA 2729-30.  On January 4, 2015, Harrison and Barronette lured Chase into an alleyway where they gunned him down.  *Id.*

Similarly, on March 2, 2015, Marquez Jones was killed.  JA 1797-1809; JA 2731-32; SJA 55-58; SJA 135-38.  Sometime in 2014, Jones robbed TTG member Tevin Haygood of marijuana and drug proceeds.  *Id.*  Haygood and Barronette discussed retribution, but Barronette encouraged Haygood to wait until more time passed since the robbery.  *Id.*  On March 2, 2015, Haygood, Barronette, and others were near West LaFayette Street and observed Jones.  *Id.*  Barronette then encouraged Haygood to kill Jones and directed him on how to carry it out.  *Id.*  While Jones was sitting on the steps in front of 1312 West LaFayette Street, Haygood brandished the firearm and shot Jones multiple times.  *Id.*

Then, in July 2015, TTG committed a triple murder-for-hire at the behest of a member of YGG.  JA 1642-60; JA 2734-35.  Specifically, a member of a rival gang had authorized $10,000 for Barronette to kill Lamont Randall.  *See id.*  Accordingly, on July 7, 2015, Barronette and TTG associates John Harrison,

9

Brandon Bazemore, Antonio Addison and others retrieved gloves, masks, and multiple firearms and then traveled in two vans to the 900 block of West Fayette Street, where Randall was located. *See id.* Upon arriving, they exited the vans and fired dozens of rounds at Randall. *See id.* Law enforcement responded to the 900 block of West Fayette Street and discovered Randall, Gerald Thompson, and Jacqueline Parker lying on the street in front of 907 West Fayette Street, all suffering from fatal gunshot wounds. *See id.*

Similarly, beginning in early 2016, members of TTG, including Barronette and Sivells, were involved in an escalating violent feud with Andrew Johnson, Amos Johnson, Brandon Bazemore, and Antonio Addison, which resulted in the murder of Addison. JA 3760. The feud started over the belief that Andrew Johnson had cooperated with law enforcement. *Id.* Then, on May 25, 2016, an individual fired shots into a car occupied by Bazemore and Johnson; after the hit, law enforcement intercepted a call involving Sivells in which he asked the shooter whether he had "hit" Bazemore, who sustained non-life-threatening injuries. *Id.* Then, that same day, Sivells and Barronette observed Antonio Addison and Andrew Johnson together in a vehicle. *Id.* Sivells stated that they needed to kill Addison because he was associating with Johnson who was believed to be an informant. *Id.* Sivells and Barronette responded by retrieving firearms and

10

traveling to Johnson's grandmother's residence on N. Carey Street. *Id.* Upon locating Addison there, they shot and killed Addison on the front steps. *Id.*

In addition to these completed murders, the trial in this matter also featured evidence of the gang's unfulfilled plans to murder others. For example, on January 22, 2016, between 6:50 pm and 7:00 pm, law enforcement officers intercepted a series of calls between Barronette and co-defendant Linton Broughton, in which Barronette, Broughton, and Sivells were looking for several individuals that robbed a member of the gang ("Mike"). JA 3759. During the conversation, Barronette was riding in a vehicle with Sivells and Broughton was on the street looking to murder the culprits. *Id.* On several occasions, Barronette and Broughton called out the location of the individuals. *Id.* For example:

LB: Where they went at? They went straight down?

MB: I don't know. Ya'll just told me they ya'll, they walked down Mosher

LB: They went straight down Mosher

UM2: They went Mosher towards Appleton yo.

LB: Going towards Appleton.

MB: Where the fuck ya at?

LB: Stay wit em, come on.

MB: Stay wit em. Stay with their ass.

11

*Id.* At one point, Barronette stated that he wanted to obtain a firearm ("[a]bout to grab that other jimmy mack"). *Id.* Later, Sivells commented that the individuals walked past Broughton and he was supposed to kill them ("[w]hy fuck Marty[1] let 'em go past him though. He froze? That's supposed to be his time to shine"). *Id.* They located the individuals entering a residence on Riggs Avenue and Barronette commented that he should have exited the vehicle and shot the individuals ("[t]hey going in a house with a gate. On Riggs and Appleton? You should have let me jumped out and pop one of their asses"). *Id.* Barronette then discussed the robbery with "Mike" and confirmed that the robbers stole "Mike's" cell phone, drug proceeds, and four "bags" of heroin ("I only sold like four bags so it was probably was like $40"). Barronette relayed the information to Sivells, who responded: "[t]hey took the what? He better go shoot that motha fucka up." *Id.* Ultimately, Barronette and Broughton did not shoot at the individuals because law enforcement moved into the area and briefly detained Barronette and chased Broughton, who discarded two firearms. *Id.*

Similarly, in April 2016, TTG members believed that Cedric Catchings had murdered a TTG associate named "Slow." JA 3759. On April 14, 2016, Floyd

---

[1] Broughton's nickname was "Marty."

12

contacted Barronette and informed him that Catchings was located near Antonio

Addison's grandmother's residence on N. Carey Street.  *Id.*   Barronette and

others then drove to Sandtown, retrieved firearms and met with co-defendant

Brandon Wilson, Sivells, and others.  *Id.*   Those individuals then departed

Sandtown and drove toward Catchings' last known location for the specific

purpose of killing Catchings.   Law enforcement officers, however, intervened and

thwarted the defendants' plan to kill Catchings.  *Id.*

The jury convicted the defendants on all charges.   JA 3393-3416 (Verdict

Form).   The defendants were sentenced.   This appealed followed.

## SUMMARY OF ARGUMENT

The defendants in this case engaged in large-scale drug-dealing, repeated

murder, and contract-killing.   All of these acts were done to protect their turf,

dispatch rivals, assist other gangs, and generally further their criminal enterprise,

TTG.   After being convicted at trial on all counts, the defendants raise numerous

challenges to their convictions and sentences.   Because none of them has any

merit, this Court should affirm.

## ARGUMENT

### I.  The Count One RICO Conspiracy Charge Was Valid

The defendants first challenge the constitutional validity of the RICO

13

conspiracy statute under which they were convicted, raising vagueness claims.

Def. Br. at 16.   Under binding Circuit precedent, this argument fails.

### A.   Standard of Review

This Court reviews de novo vagueness challenges to federal statutes.

*United States v. Williams*, 364 F.3d 556, 559 (4th Cir. 2004).

### B.      Binding Precedent Confirms That The RICO Conspiracy Statute Is Not Vague

The Supreme Court has established a standard that is easy to meet for the

level of definition required in any federal criminal statute.   Federal laws must be

upheld and vagueness challenges must be rejected where the statutes simply "give

people 'of common intelligence' fair notice of what the law demands of them."

*United States v. Davis*, 139 S. Ct. 2319, 2325 (2019) (quoting *Connally v. General*

*Constr. Co.*, 269 U. S. 385, 391 (1926)).   When a party brings a vagueness

challenge, the reviewing court must consider "the particular facts at issue, for '[a]

plaintiff who engages in some conduct that is clearly proscribed cannot complain

of the vagueness of the law as applied to the conduct of others.'"   *Holder v.*

*Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010) (citation omitted).

Against these standards, this Court has twice previously rejected vagueness

challenges to the RICO statute in precedential opinions.   In *United States v.*

14

`

*Bennett*, 984 F.2d 597, 605-07 (4th Cir. 1993), this Court upheld the RICO statute against a vagueness claim, noting that every circuit to have considered the issue also rejected vagueness challenges. *Id.* Moreover, in looking at the specific facts of the case, this Court in *Bennett* noted that it was beyond question that the defendants' challenge failed because surely they had "adequate notice that acts of arson, fraud, attempted murder (and other acts or threats of violence)" in furtherance of their enterprise were wrong and "fell within those acts contemplated by a RICO enterprise and a RICO conspiracy." *Id.*

Similarly, in *United States v. Borromeo*, 954 F.2d 245, 248 (4th Cir. 1992), this Court rejected the argument that "the phrase 'pattern of racketeering activity' was unconstitutionally vague," noting that "a majority of the Supreme Court in [*H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989)] implicitly rejected that suggestion."

Similarly, the Supreme Court rejected a vagueness challenge to a state RICO statute that is similar to the federal RICO statute at issue here. *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 58 (1989) ("We find no merit in petitioner's claim that the Indiana RICO law is unconstitutionally vague as applied to obscenity predicate offenses. Given that the RICO statute totally encompasses the obscenity law, if the latter is not unconstitutionally vague, the former cannot be vague

15

either.").

Pursuant to this binding precedent, this Court must reject the defendants' vagueness challenge to their Count One convictions. *Bennett* and *Borromeo* are controlling, and a panel of this Court cannot overrule precedent established by a prior panel of this Court. *McMellon v. United States*, 387 F.3d 329, 332 (4th Cir. 2004) (en banc). Furthermore, the Supreme Court's decision in *Fort Wayne* is highly instructive and persuasive authority. This should end the matter.

Nor should this Court countenance the argument made by the defendants (Def. Br. at 19) that recent Supreme Court rulings about other statutes somehow impact these precedents. They do not. The Supreme Court's decisions in *Johnson v. United States*, 135 S. Ct. 2551 (2015), *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), *Davis v. United States*, 139 S. Ct. 2319, 2325 (2019) all concerned the so-called "residual clause," which triggered enhanced criminal penalties where conduct posed "a serious potential risk of physical injury to another." That vague phrase is nowhere in the RICO statute. Rather, the defendants here are challenging only the definition of the terms "pattern of racketeering activity" and "enterprise." Because this Court has already decided those terms are sufficiently defined, and because no recent Supreme Court authority has held to the contrary, this argument must be rejected. *See United States v. Johnson*, 825 Fed. Appx.

16

`

156, 170 (5th Cir. 2020) (rejecting vagueness arguments as to RICO statute,

notwithstanding *Dimaya* and *Johnson*); *United States v. Bazemore*, 2020 WL

5653364, 2020 U.S. Dist. LEXIS 174745 (D. Md. Sept. 23, 2020) (same).

Moreover, even if the defendants' claim is not barred by the precedents in

*Bennett* and *Borromeo* (and it is), it is surely barred by the facts of this case.   This

Court has made clear that vagueness challenges must be analyzed based on the

facts presented and the specific conduct of the defendants.   *United States v.*

*Jaensch*, 665 F.3d 83, 89 (4th Cir. 2011).   The defendants here engaged in a

pattern of drug-dealing, and they also kidnapped and murdered people to defend

their turf, inflict retribution on those who robbed them, and on contract from other

gangs, all so they could increase their proceeds and further their enterprise.   As

this Court noted in *Bennett*, "surely" the defendants were on notice that this kind of

pattern of murder, mayhem, and drug-dealing was in violation of RICO.   The

vagueness challenge fails.

## II.     The Tracking Orders And Wiretaps Were Supported By Ample Probable Cause

Defendant Sivells challenges tracking orders and wiretap orders on two

phones he was utilizing during the drug conspiracy, TT4 and TT5.   Def. Br. at 20-

23.   Because there was ample probable cause that supported these warrants, and

17

`

because law enforcement relied on them in good faith, this Court should affirm.

### A.      Standard of Review

When reviewing a district court's denial of a motion to suppress, this Court reviews legal conclusions de novo, and any factual determinations only for clear error. *United States v. Kelly*, 592 F.3d 586, 589 (4th Cir. 2010). Where, as here, the district court denied the defendant's motion to suppress, this Court construes the evidence in the light most favorable to the government. *Id.* The standard of review governing affidavits in support of wiretap orders is identical to the standard governing the review of search warrants, because a wiretap order is a specialized sort of search warrant. *United States v. Talbert*, 706 F.2d 464, 467 (4th Cir. 1983).

A reviewing court is not to substitute its judgment as to probable cause, but need only determine whether there was a "substantial basis" for the issuing court's determination of probable cause. *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). Great deference is paid to an issuing judge's determination of a substantial basis for concluding that electronic surveillance will uncover evidence of wrongdoing. *United States v. DePew*, 932 F.2d 324, 327 (4th Cir. 1991).

Moreover, under the "good faith" exception, the exclusionary rule does not apply when law enforcement agents act in objectively reasonable reliance on a

18

warrant later held invalid.  *See Davis v. United States*, 564 U.S. 229, 238-39 (2011); *United States v. Leon*, 468 U.S. 897, 922 (1984).  "A defendant always bears a heavy burden when he argues after-the-fact that an officer could not rely in objective good faith on a search warrant."  *United States v. Miller*, 809 Fed. Appx. 131, 140 (4th Cir. 2020).

### B. The Warrants And Wiretaps Were Supported By Ample Probable Cause

To assess whether probable cause exists to issue a search warrant, the issuing judge must "make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Gates*, 462 U.S. at 238.  Importantly, "a finding of probable cause does not require absolute certainty" that contraband will be found during the search; rather, a warrant must be upheld if the facts therein show only a "'fair probability'" that contraband will be found.  *United States v. Gary*, 528 F.3d 324, 327 (4th Cir. 2008) (citation omitted).

Here, the search warrants and wiretaps obtained by the government were amply supported by probable cause, and hence the district court properly rejected the defendants' motions to suppress.  Specifically, while defendants Sivells and

19

`

Floyd challenge the tracking order entered for (443) 403-9160 ("TT4"), a Title III

wiretap order for TT4, a subsequent wiretap of (443) 254-6202 ("TT5") and a

search warrant at 2307 Avalon Avenue that they claim were derivative of these

orders as to TT4, these arguments must be rejected.

With regard to the tracking order for TT4, a federal magistrate judge issued

a search warrant on February 5, 2016, permitting the government to receive

location information as to TT4, a phone used by Sivells.   JA 775-88.   The 11-

page affidavit supporting the warrant application detailed at length the probable

cause that Sivells was involved in drug trafficking and was using that phone.

Specifically, the affidavit detailed how: (1) a confidential source of information

(CS-4) indicated that Montana Barronette was engaged in heroin trafficking in the

area of N. Carrollton Street and Riggs Avenue in Baltimore; (2) during

surveillance in August 2015, law enforcement observed Barronette's brother,

Sivells, in that area "overseeing" the distribution of drugs and "advising buyers

where to go;" (3) in November 2015, CS-4 made a controlled purchase of heroin

from Barronette; (4) on January 23, 2016, an intercepted call on TT3 between

Barronette and Sivells which featured them discussing guns and drugs, including

specifically a police seizure that took place on January 22, 2016; (5) in February

2016, CS-4 indicated that Sivells had recently acquired TT4 and was using the

20

phone to facilitate drug deals; and (6) in February 2016, CS-4 made a controlled call to Sivells on TT4 and "used street jargon to ask about purchasing cocaine" and "SIVELLS agreed to the deal and directed CS-4 to the drug shop on Calhoun Street."   JA 781-87.   Because this warrant was supported by a plethora of probable cause, the district court properly denied Sivells' motion to suppress.   JA 869.

With regard to the subsequent wiretap of TT4, the government submitted a 52-page affidavit which included even more support for the probable cause finding.   JA 309-61.   Specifically, in addition to the facts included in the tracking warrant recounted above, the government also included in this warrant that: (1) Sivells had a significant criminal history, including three drug-related convictions; (2) Sivells was arrested for drug distribution multiple times around the Calhoun Street drug shop; (3) in July 2015, a search warrant was obtained for the residence of Sivells' sister, a location where Barronette was known to frequent, and drug packaging materials were found; (4) Sivells and Barronette were subjected to a traffic stop on January 28, 2016 during which a small amount of marijuana was recovered; and (5) toll records of TT4 showed that the phone was routinely calling Barronette, a known drug dealer.   *Id.*   The affidavit also contained intercepts between Sivells and Barronette over another phone that was being intercepted,

21

TT3. *Id.* In one of those calls from January 23, 2016, Sivells and Barronette discussed how Barronette and Broughton were chased by the police the day prior, and how Broughton lost two guns and some marijuana. JA 336-41. Following a hearing, the district court denied the motion to suppress the wiretap. JA 869. At the hearing, the district court specifically found that there was ample probable cause simply based on the calls involving CS-4 alone. JA 562-63. The court also indicated that good faith would apply as well. *Id.* Those rulings were both sound, and should be upheld on appeal, specifically given the substantial deference that is due to the underlying probable cause findings by the issuing judge.

Finally, with regard to the wiretap of TT5, law enforcement submitted a 75-page affidavit detailing ample probable cause to intercept this line associated with Sivells. JA 450-523. In addition to the information previously provided in the TT4 affidavit, the TT5 affidavit also included: (1) a controlled call by CS-4 to TT5 wherein Sivells answered and CS-4 indicated he was going to purchase a quantity of drugs; (2) a pertinent call from March 4, 2016 over TT4 in which Sivells discussed having "9" and waiting on one more, referring to drugs or proceeds; (3) a March 5, 2016 pertinent call over TT4 in which Sivells discusses getting "grass" referring to marijuana; and (4) a March 7, 2016 call over TT4 in which Sivells was discussing how he cuts and packages drugs ("I do like two ounces on the half").

22

*Id.* There were several other pertinent TT4 calls included in the affidavit as well. *Id.* This was more than enough to establish the probable cause finding as to TT5, and it was also supported by good faith.

And then with regard to the search warrant at 2307 Avalon Avenue, there is more than ample probable cause to support that warrant as well. That affidavit detailed the following: (1) controlled purchases of heroin from Barronette and Sivells in November 2015 and January 2016; (2) an intercepted call between Sivells and another individual in March 2016 discussing obtaining additional drugs; (3) Sivells' utilizing a residence located at 1315 Harlem Avenue to distribute drugs; (4) multiple intercepted calls in June and July 2016 in which Sivells discusses drug transactions and uses coded language like "hard" and "boy;" and (5) physical and electronic surveillance of Sivells at or near the residence and information from CS-4 that Sivells was recently in the residence. *See* SJA 147-57 (ECF 274, Attachment O). This warrant was valid as well, and also supported by good faith.

And against the mountain of probable cause in these warrants, the defendants' only claim is that one small incident mentioned in the TT4 warrants was handled by officers who were subsequently convicted of crimes wholly separate from any investigations they conducted in this case. Indeed, the

23

defendants are quick to admit that "there are no allegations of misconduct against the agents and officers who investigated the present case." Def. Br. at 22. However, they note that on January 22, 2016, Baltimore Police Department officers Wayne Jenkins, Evodio Hendix, and Marcus Taylor were involved in the arrest of Linton Broughton. *Id.* They then note that in November 2017, these officers were indicted for separate criminal offenses in which the officers robbed people under false guise of legitimate police action. *Id.*

There are multiple problems with the defense claims here. First, the defendants offer zero evidence that the January 22, 2016 arrest was somehow tainted or the subject of any unlawful activity whatsoever by Jenkins, Hendrix, or Taylor. In fact, far from there being evidence that Broughton was a random target of these local police officers' separate nefarious activities, these officers responded to the scene after federal law enforcement officers conducting this investigation issued a BOLO for the defendants to make an arrest to try to interrupt violence they believed that Barronette and his associates were going to perpetrate in retaliation for an alleged slight on one of the members of their DTO. JA 386-93. The government had wiretapped another phone used by Barronette (TT3) and heard Broughton describe how a member of the DTO had been robbed, and how Barronette discussed getting a gun in an effort to inflict retaliation. Based on

these intercepts over TT3, Jenkins, Hendrix, and Taylor were randomly in the area and responded to the BOLO and tried to make a traffic stop.   This resulted in Barronette and Broughton crashing their car in the snow and discarding their guns. There is simply nothing alleged, much less proven, that anything about this incident was unlawful.   As such, it was permissible to include in the affidavit and supports the probable cause finding.

Indeed, underscoring that the defense claims are wholly unsupported, law enforcement intercepted a call on January 23, 2016 over TT3 between Barronette and Sivells in which they recount precisely what happened the day prior.   In this way, the government did not even need to rely on any averment by these now-tainted local officers who later pled guilty to separate crimes; rather, the officers' version of events was corroborated by the January 23rd conversation between Barronette and Sivells themselves.   This alone is enough to reject the defense claims here.

At root, the defense cannot avoid their burden to identify some problem with the January 22, 2016 encounter by simply averring generally and broadly that the now-former officers had started their robbery scheme back in 2015.   Simply because the officers committed some crimes on some occasions does not mean that they were committing crimes on all occasions.   And specifically, there was no

25

evidence of these officers committing any crimes as to Broughton and Barronette on January 22, 2016.

Second, and alternatively, even if we must robotically excise from the affidavit each and every mention of the actions of the local officers during the January 22, 2016 incident, this would simply result in the excision of a few paragraphs these affidavits.  The rest would remain.  And the rest is more than sufficient to support the probable cause finding.  As such, the defense challenges to these warrants must fail.  *See United States v. Fall*, 955 F.3d 363, 371-72 (4th Cir. 2020) ("'[T]he case law establishes that, even if an affidavit supporting a search warrant is based in part on some illegal evidence, such inclusion of illegal evidence does not taint the entire warrant if it is otherwise properly supported by probable cause.'") (citation omitted); *United States v. Apple*, 915 F.2d 899, 909 (4th Cir. 1990) ("[T]he inclusion of certain illegally obtained information in the application for a search warrant does not require suppression of the evidence seized under the warrant . . . if, excluding the illegally obtained information, probable cause for the issuance of the warrant could still be found.").

Moreover, in addition to being wrong as to the TT4-related warrants, the defense arguments about TT5 and Avalon Avenue are also not well-taken.  As an initial matter, because the claims as to TT4 fail, the derivative arguments about

26

TT5 and Avalon Avenue fail as well.   But even if there were some issue with the

TT4 warrants, the defense is wrong to claim that TT5 was derivative of TT4.   It

was not.   In fact, even without the information obtained from TT4, the wiretap for

TT5 was still supported by more than sufficient independent probable cause.

Specifically, the affidavit began by recounting background information

establishing that Barronette was involved in drug trafficking, and included

information from CS-4 indicating that Sivells was his brother and also involved in

drug trafficking.   JA 469-75.   All of this information was obtained prior to, and

independent of, TT4.   Moreover, law enforcement identified TT5 through CS-4

and other independent means.   JA 477-78.   Specifically, CS-4 made a controlled

call to TT5, and the phone was answered by Sivells.   *Id.*   Then, law enforcement

observed Barronette identify TT5 as his number on Instagram.   *Id.*   Then CS-4

made a controlled call to TT5, Sivells answered, and CS-4 indicated he was going

to place an order for drugs later.   *Id.*   Thus, even if there were some problem with

TT4 (and there is not), TT5 remains valid.   *Fall*, 955 F.3d at 371-72.   Similarly,

the search warrant affidavit for 2307 Avalon Avenue was based on separate

probable cause as well.

Finally, the defendants' argument must be rejected for another reason:

good faith.   As the district court found as to the TT4 wiretap, the allegations

27

against Jenkins, Hendrix, and Taylor only materialized after the warrants were obtained in this case. There was no evidence that the affiants in this case had any knowledge about the separate criminal conduct of these officers. The officers here wholly relied in good faith on the legitimacy of the warrants at the time they were obtained. Accordingly, this provides a further ground to reject the defendants' arguments here.

## III. Sivells' Post-Arrest Statements Were Admissible

Sivells' next challenge is to the admission of statements he made to law enforcement following his arrest on October 27, 2016. Def. Br. at 29. Because *Miranda* warnings were properly given, and because Sivells never made any express request for an attorney, Sivells' challenge fails. Additionally, any error was harmless.

### A. Standard of Review

This Court reviews the factual findings underlying a motion to suppress statements for clear error and the district court's legal determinations de novo. *United States v. Hashime*, 734 F.3d 278, 282 (4th Cir. 2013). When a suppression motion has been denied, this Court reviews the evidence in the light most favorable to the government. *Id.*

### B. Sivells' Post-Arrest Statements Were Admissible

28

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. CONST., amend. V.  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Court adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from any compelling pressures associated with custodial interrogation.  *Id.* at 467.  After the warnings are given, if the suspect indicates that he wishes to remain silent, the interrogation must cease.  *Id.* at 473-474.  Similarly, if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present.  *Id.* at 474.

Importantly, however, a defendant's request to speak with counsel must be unequivocal.  In *Davis v. United States*, the Supreme Court held that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning."  512 U.S. 452, 459 (1994).  In *United States v. Johnson*, 400 F.3d 187 (4th Cir. 2005), this Court catalogued the kind of equivocal statements that are ***not*** sufficient:  "Maybe I should talk to a lawyer," "I might want to talk to an attorney," "I think I need a lawyer," "Do you think I need an attorney here?," "I might want to get a lawyer then, huh?," "I think I want a lawyer," "Do you think I need a lawyer?," "I can't afford a lawyer but is there

29

`

anyway I can get one." *Id.* at 195.

Moreover, voluntary confessions are to be encouraged. They are not merely "a proper element in law enforcement," *Miranda*, 384 U.S. at 478, they are also an "unmitigated good," and "'essential to society's compelling interest in finding, convicting, and punishing those who violate the law.'" *McNeil v. Wisconsin*, 501 U.S. 171, 181 (1991).

Here, Sivells was arrested on October 27, 2016 by members of the Baltimore Police Department on an arrest warrant. JA 649-50. Upon arrest, he indicated he wanted to speak more with law enforcement. JA 659. He was taken to the police station and immediately read his *Miranda* rights. JA 651. (Sivells indicated this was not the first time he had been read his *Miranda* rights. JA 659.) He was given a standard police form explaining his rights. JA 651-52; SJA 162. Sivells read aloud each right and signed the form, indicating he understood his rights. JA 652; SJA 162 (*Miranda* waiver form signed by Sivells indicating, "I have been advised of and understand my rights. I freely and voluntarily waive my rights and agree to talk with police without having an attorney present"). During this time, he never indicated that he wanted to speak with an attorney. JA 654. Rather, at one point, he clarified, "I can't use my cell phone to call my attorney;" and when he was told that was correct, i.e. that he could not use his phone at this time, the

30

officer indicated that if he wanted to speak to an attorney, the interview would

cease.   JA 662-64.   Despite this opening, Sivells did not indicate a desire to speak

to a lawyer.   Then, the officer summarized again, and stated, "if you want to talk

with us right now, sign right th[ere]."   *See* JA 678 (referring to video of interview

which was admitted at trial as Exhibit CD-8).   Sivells signed and continued to

answer questions.   *See id.*

On these facts, the district court properly concluded that Sivells waived his

*Miranda* rights and knowingly and voluntarily agreed to speak with law

enforcement.   JA 817-18.   The court noted that the officer made clear Sivells'

rights, and that Sivells did not make an unequivocal request to speak to an

attorney.   *Id.*   The court further noted that "he [Sivells] chose to keep on talking,

despite, I think, a thorough understanding and explanation of his rights."   *Id.*   In

this way, the government satisfied *Miranda*, and pursuant to *Davis* and *Brown*,

Sivells did not make an unequivocal call to cease questioning and speak to an

attorney; he in fact did the opposite by signing the waiver and continuing to answer

questions.   This Court should therefore affirm.

Moreover, even if there were some error in the admission of this evidence, it

was harmless.   When evidence is improperly admitted, the court must "review[]

the remainder of the evidence against [him] to determine whether the admission of

31

the confession was harmless beyond a reasonable doubt." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). The inquiry requires the court to evaluate the record as a whole, and determine whether it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty, absent the confession or statement. *Johnson*, 400 F.3d at 197. While a defendant's own words can be damning, this Court has upheld a conviction where a defendant's own statements were improperly admitted. *Id.*

Here, as detailed above, there was abundant evidence introduced against Sivells aside from his statements. There was testimony about his drug-dealing, including testimony and video of the controlled purchases involving him. There were numerous wiretap calls in which Sivells was conducting drug business. There was also physical evidence introduced from the search warrant executed at Sivells' residence. In short, there was a sea of evidence, of which the statement challenged here was just a drop. This Court should affirm.

## IV. The District Court Properly Exercised Its Discretion In Controlling Access To The Courtroom To Address Security Concerns

Defendants next challenge the district court's decision to limit the number of people who could be present in the gallery of the courtroom to 25, while allowing any overflow to listen to the proceedings in a different courtroom. Def. Br. at 32.

32

This challenge also fails.

As detailed above, this trial featured evidence that the defendants perpetrated multiple murders and numerous acts of violence. If that were not enough, in the run-up to the trial, a government witness and cooperator, Guy Coffey, was murdered in what was described as a "targeted killing." JA 870-71. The trial began on September 17, 2018. Then, a fight broke out in the gallery on the second day of trial. JA 1130. There were also instances in which defendants were attempting to make case-related comments to members of the gallery. Trial Tr., September 18, 2018, at 44-45. Also, two of the defendants, Harrison and Tillman, assaulted a court staff member.[2] JA 1130. There were also numerous outbursts from the galley, particularly during the testimony of a cooperator. JA 1130. Finally, as a culmination of these escalating attacks on the proceedings, the court decided to limit in-person courtroom access to 25 persons because of the "security issue[s]." JA 1109.1. But rather than simply exclude all overflow, the district court instead instructed court personnel to "divert additional spectators to Courtroom 7D to listen to the proceedings that way." JA 1109.2. In explaining its rationale, the district court stated as follows:

---

[2] They later pled guilty to assaulting a federal officer. See Case No. CCB-18-612 (D. Md.).

33

I would start, first of all, with the fact that this case involves, according to the grand jury indictment, which is probable cause established, approximately a dozen murders.

The second point is that there are at least two cooperating witnesses, Mr. Coffey and Mr. Brown, who have been murdered, at least plausibly in connection with this case.

There are two defendants, Mr. Tillman and Mr. Harrison, who at least -- again, there is at least probable cause to believe assaulted two deputy marshals in the course of being taken out from the courtroom.

. . .

Regarding the gallery, there was a fight in the gallery the second day of this trial. People had to be removed.   There have been a number of verbal outbursts, especially when there was a video of Ronnie Johnson -- that is, from the gallery, I mean.

On Wednesday a spectator was found in the gallery who had managed to get a knife or box cutter of some kind into the gallery.   That same night, Wednesday night, it was discovered that one of the wooden tables in the lobby area immediately outside 1A had been vandalized. And by that, I mean someone, presumably some member of the public, but the letters TTG were scratched into the surface several times. That's obviously the name of this gang.

And then most significant -- well, in addition to that was a jail call Friday night from Montana Barronette which at least has a plausible interpretation of a request to pack the courtroom, essentially, get additional people in the courtroom when cooperating witnesses are testifying, which raises the possibility of intimidation of those witnesses.

So after consulting with the marshals and also with counsel Wednesday night, I will repeat what I had determined to do so far, if necessary, would be that once there's a number of the general public

34

equivalent to what defense counsel proffered there had normally been, approximately 25, in that range, in addition to court employees, the Court would then, based on marshals' advice, make 7D available for any additional spectators who wish to avail themselves of that.   And in 7D, there would be audio. Everything could be heard.

JA 1130.   Only counsel for Harrison and Tillman objected.   *Id.*

## A.   Standard of Review

A district court's decision to partially limit access to a courtroom proceeding is a constitutional question that is reviewed de novo.   *United States v. Osborne*, 68 F.3d 94, 98 (5th Cir. 1995).   For defendants who do not raise a contemporaneous objection (here, everyone other than Harrison and Tillman), the heightened plain error standard applies.   *United States v. Williams*, 974 F.3d 320, 344 (3rd Cir. 2020).

## B.     The District Court Properly Exercised Its Discretion To Ensure The Security Of The Trial

The Sixth Amendment guarantees a defendant the right to a public trial. *Gannett Co. v. DePasquale*, 443 U.S. 368, 379-81 (1979).   Additionally, the First Amendment guarantees the public the right to access a criminal trial.   *Richmond Newspapers v. Va.*, 448 U.S. 555, 575 (1980).

"Yet the right is not absolute, and the Supreme Court has long recognized that trial judges have discretion to impose reasonable limitations on access to a trial

35

when overriding interests . . . are likely to go unprotected if closure is not employed." *Bell v. Jarvis*, 236 F.3d 149, 165-66 (4th Cir. 2000) (quoting *Waller v. Georgia*, 467 U.S. 39, 45 (1984)). In this way, this Court has recognized that a "trial judge may impose reasonable limitations on access to a trial in the interest of the fair administration of justice." *Bell v. Evatt*, 72 F.3d 421, 433 (4th Cir. 1995)

In *Waller*, the Supreme Court enunciated a four-part test to apply when a district court *totally* closes a courtroom proceeding to everyone except the parties and counsel. Specifically,

(1) the party seeking to close a public hearing must advance an overriding interest that is likely to be prejudiced;

(2) the closure must be no broader than necessary to protect that interest;

(3) the trial court must consider reasonable alternatives to closing the proceeding;

(4) the court must make adequate findings of fact to justify its actions.

*Id.* at 45.

However, when a trial court only imposes a *partial* closure, a less stringent test applies. Appellate courts simply review the decision to ensure that the court's decision served a "substantial interest" and that the defendant was afforded the basic protections that the right of public access was meant to serve. *See Osborne*,

36

68 F.3d at 98-99 (citing decisions from the Second, Eighth, Ninth, Tenth, and Eleventh Circuits).

Under these tests, this Court and others have upheld reasonable limitations on access to the gallery during a proceeding.   For example, a judge may limit ingress and egress into the courtroom during a witness's testimony to prevent disruption.   *Evatt*, 72 F.3d at 433-34; *Snyder v. Coiner*, 510 F.2d 224, 230 (4th Cir. 1975).   Similarly, courts have upheld reasonable limitations on the number of people in the gallery to observe a trial.   *See United States v. Cervantes*, 706 F.3d 603, 612 (5th Cir. 2013) (allowing each defendant only three relatives in courtroom during voire dire); *United States v. Shryock*, 342 F.3d 948, 974-75 (9th Cir. 2003) (rejecting complaint that small size of the courtroom did not allow for all the observer and family members desired by the defendants); *cf. Woodson v. Hutchinson*, 52 Fed. Appx. 195, 198 (4th Cir. 2002) (holding in the context of ineffective assistance inquiry that there was no precedent indicating a judge could not limit access to the courtroom during voire dire because of "the lack of sufficient space to accommodate Woodson's family along with all the prospective jurors").   Indeed, the Supreme Court itself recognized that "since courtrooms have limited capacity, there may be occasions when not every person who wishes to attend can be accommodated."   *Richmond Newspapers*, 448 U.S. at 581 n.18.

37

Finally, even where there is a violation, a case may still be affirmed if the defendant cannot show prejudice. *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910-13 (2017).

Under these precedents, it is clear that no violation occurred here. The court explicated a more than "substantial" reason for its decision. The case involved a violent, murderous gang and that violence spilled into the very gallery of the courtroom while the case was being tried. The court explained the security issues attendant to the situation, and took reasonable steps to lessen the near occasion of further violence and disruption. JA 1130. The court did not totally close the proceedings to the public. Rather, the court limited the number of people in the gallery and allowed an alternative courtroom for any overflow. JA 1130. In this way, the court had a "substantial" reason for its actions, and the defendants were not deprived of the general protections guaranteed by the Sixth Amendment. At all times at least 25 members of the public were allowed to view the proceedings. This comports with the test in *Osborne*. *See Cervantes*, 706 F.3d at 612; *Shryock*, 342 F.3d at 974-75. This even comports with the heightened test in *Waller* as well.

Indeed, in evaluating this issue, the Supreme Court has indicated we must look at interests served by the public trial right. *See Weaver*, 137 S. Ct. at 1910-

38

12.   Those interests include the due process protections for the accused and the need for the public to bear witness to the conduct of the prosecution and to participate in the vindication of a violation of society's laws.  *See id.*  In this way, the Supreme Court has held that the public's representation at trial is designed to "enhance the integrity and quality of what takes place" in federal court.  *Richmond Newspapers*, 448 U.S. at 578.

However, when members of the public cause security concerns and bring violence into the courtroom, the opposite happens:   the integrity and quality of the trial is imperiled.   Federal court is not a fight club.   And district judges need not remain paralyzed when their courtrooms are devolving into one.   In this way, the public's right of access is not absolute; it is tempered by, and conditioned on, the district court's need to maintain order and security.   Indeed, a defendant himself can be removed from the courtroom at his own trial if he is disruptive and violent. *Illinois v. Allen*, 397 U.S. 337, 338 (1970).   Because the district court was well within its rights to take the steps it did here, this Court should affirm.

And nothing in the defendants' opening brief demonstrates otherwise. While the defendants first argue that the court did not have an overriding interest, Def. Br. at 37, they are wrong.   The fight in the gallery, the murdered government witnesses, the vandalized table outside the courtroom, the one spectator with a

39

knife, the jail call to flood the courtroom:   all of these incidents culminated into a

clear and present security concern.   If the court allowed the courtroom to swell

and another fight broke out or someone attempted to disrupt the proceeding, the

sheer number of observers would have overwhelmed court security and impacted

the trial.   The Supreme Court has always recognized that trial courts have

overriding interests in physical security and courtroom decorum.   *See Deck v.*

*Missouri*, 544 U.S. 622, 628-29 (2005) (explaining how these interests could be

used to justify shackling defendants during trial).

The defendants are also wrong to contend that this decision was not

narrowly-tailored.   As an initial matter, the 25-person figure appears to have been

arrived at based on the proffer of defense counsel as to how many people were

usually in the gallery.   *See* JA 1131.   In this way, the court tailored the remedy to

what the defense indicated was already the usual capacity.   But even taking the

argument at face value, the court's decision *was* narrowly-tailored.   The court did

not close the entire proceeding to the public.   It did not exclude anyone over the

limit entirely from the courthouse.   Rather, the court made an overflow courtroom

available.   This was more than reasonable and specifically tailored to address the

40

security issues that had arisen.[3]   *See Bell*, 236 F.3d at 169 (holding that measures

were reasonably tailored where they allowed the public access to recordings of the

proceedings).

Nor are the defendants correct that the court did not consider alternatives.

The record makes clear that the court consulted with courthouse security personnel

and counsel, and arrived at the 25-person figure.   JA 1130.   This is more than a

sufficient showing of considering alternatively.   Moreover, the fact that the court

did not completely close the proceeding to the public, but instead stopped well

short of that, demonstrates that alternatives were considered.   *Bell*, 236 F.3d 169

(holding that "the limited nature of the closure directed by the trial judge . . .

suggests that he considered" alternatives).

In sum, Defendants Harrison and Tillman fail to demonstrate any error here,

and the rest of the defendants certainly cannot meet the high bar for plain error.

The courtroom here simply was not closed.   Rather, during all stages of the trial, it

was open and subject to public scrutiny.   That the courtroom did not include each

---

[3] The Defendants seem to take issue with how court security personnel enforced
the court's ruling.   Def. Br. at 39.   The defendant do not cite any portion of the
record where they complained to the judge about this.   In this way, the
government submits this issue is not properly before the Court.   While this may
give rise to a *Bivens* action against the court personnel, the district judge cannot
assailed for facts not brought to her attention.

41

and every person the defendants wanted at trial does not rise to the level of a constitutional concern.   And even if there was a violation, it was harmless and did not impact substantial rights.

## V.   The Government Adduced More Than Sufficient Evidence On The Interstate Commerce Element In Count One

The defendants next challenge the sufficiency of the evidence adduced at trial as to their convictions under Count One for RICO conspiracy.   Def. Br. at 41-43.   As detailed below, ample evidence was presented and the jury properly convicted the defendants on this count.

### A.   Standard of Review

A "defendant challenging the sufficiency of the evidence to support his conviction bears a heavy burden."   *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997).   In reviewing the government's evidence, this Court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   *United States v. Robinson*, 855 F.3d 265, 268 (4th Cir. 2017) (internal quotation marks omitted).   During this inquiry, the Court must "assume that the jury resolved any conflicting evidence in the prosecution's favor."   *United States v. Savage*, 885 F.3d 212, 219 (4th Cir. 2018) (internal quotation marks omitted).   All inferences from the evidence must

42

be drawn in favor of the government.   *United States v. Adepoju*, 756 F.3d 250, 254

(4th Cir. 2014).   Jury verdicts should be affirmed except for the rare case "where

the prosecution's failure is clear."   *Burks v. United States*, 437 U.S. 1, 17 (1978).

### B.    More Than Sufficient Evidence Was Presented To Satisfy The Commerce Element In Count One

Federal law criminalizes those who conspire to participate in a racketeering

enterprise.   18 U.S.C. § 1962(d).   To establish a RICO conspiracy, the

government must show "that an enterprise affecting interstate commerce existed;

that each defendant knowingly and intentionally agreed with another person to

conduct or participate in the affairs of the enterprise; and that each defendant

knowingly and willfully agreed that he or some other member of the conspiracy

would commit at least two racketeering acts."   *United States v. Mathis*, 932 F.3d

242, 258 (4th Cir. 2019).

The government only must prove a "de minimis" effect on interstate

commerce.   *United States v. Zelaya*, 908 F.3d 920, 926 (4th Cir. 2018); *see also*

*United States v. Gray*, 137 F.3d 765, 773 (4th Cir. 1998).   The government can

satisfy this element by introducing evidence that "the gang regularly

communicated by phone and committed multiple robberies using guns that traveled

in interstate commerce."   *United States v. Cornell*, 780 F.3d 616, 622-23 (4th Cir.

43

2015); *United States v. Argueta*, 470 Fed. Appx. 176, 182 (4th Cir. 2012) (element met where evidence showed gang members "used the United States mails, telephones, and the internet to communicate with one another within the United States and internationally").   Likewise, it can establish this element by showing that drug products sold by a gang originated outside the United States.   *Gray*, 137 F.3d at 773.   Indeed, the Supreme Court has recognized that the sale of illegal drugs constitutes economic activity within the meaning of the Commerce Clause. *United States v. Taylor*, 136 S. Ct. 2074, 2079 (2016).

Here, the government produced ample evidence that the activities of TTG had at least a minimal effect on interstate commerce.   The government introduced wiretap calls involving the defendants showing they used phones (which are channels of interstate commerce, *see Gibbs v. Babbitt*, 214 F.3d 483, 490-91 (4th Cir. 2000)) to coordinate drug sales and gang business.   JA 3035-3366.   This alone is enough under *Cornell* and *Argueta*.   If that were not enough, the government also established that the gang used guns manufactured outside of Maryland.   JA 2386, 2388.   Finally, the government put on testimony that the drugs the gang was selling, including heroin and cocaine, were produced outside the United States and shipped into the country.   JA 2531.1-.3.   And under *Taylor*, the sale of drugs is an economic activity.   Construing all the evidence in the light

44

most favorable to the government, this is more than sufficient to establish a de minimis effect on interstate commerce.

And nothing in the opening brief demonstrates otherwise. Def. Br. at 41-43. The defendants' principal claim is that, under *United States v. Robertson*, 514 U.S. 669, 671 (1995), a heightened standard applied because TTG was involved in only intrastate conduct. This is wrong on two levels. First, this Court has repeatedly declined to impose any elevated evidentiary requirement on the interstate commerce element applicable to RICO claims. *United States v. Gutierrez*, 963 F.3d 320, 339 n.7 (4th Cir. 2020) (rejecting the claim that the government needed to show the conduct "substantially" affected commerce); *United States v. Cornell*, 780 F.3d 616, 622 (4th Cir. 2015) (rejecting decisions which impose a heightened requirement and citing *Gonzales v. Raich*, 545 U.S. 1 (2005)). In this way, the defendant's reliance on *Robertson* is untenable inasmuch as *Raich* post-dated *Robertson* and clarified that when a federal statute requires an affect on interstate commerce, such effect need only be de minimis.

Second, the defendants are wrong to suggest that TTG's activities were solely intrastate. As detailed above, they were using phones that were channels of interstate commerce, and that alone is enough to take their activity outside the realm of purely intrastate conduct. Moreover, as the defendants admit, Def. Br. at

45

43, TTG had out of state customers and suppliers.   And in any event, under

*Taylor*, drug dealing is an economic activity and hence even a purely intrastate

drug dealing operation would have a de minimis effect on interstate commerce.

## VI. The Felon In Possession Convictions Of Pulley And Wilson Must Be Affirmed

Pulley and Wilson next claim error in their convictions for being felons in

possession of firearms, citing *Rehaif*.   Def. Br. at 45-47.   These claims fail under

the Supreme Court's recent decision in *Greer*.

### A. Standard of Review

Unpreserved claims of *Rehaif* error are reviewed for plain error.   *Greer v.*

*United States*, 141 S. Ct. 2090, 2096 (2021).

### B. Supreme Court Precedent Undermines The Defense Arguments

On June 21, 2019, which was eight months after the trial in this matter, the

United States Supreme Court decided *Rehaif v. United States*, 139 S. Ct. 2191

(2019).   In that decision, the Court held that in felon-in-possession cases, the

government must prove that defendant knew he possessed a firearm and that he

knew he was a felon when he possessed the firearm.   *Id.*

After the decision was issued, this Court held that the failure to include

*Rehaif*'s required averments in the indictment and the failure to instruct the jury at

46

trial on these elements amounted to plain error.   *See United States v. Medley*, 972

F.3d 399, 416-18 (4th Cir. 2020).

However, the Supreme Court recently overruled this precedent in *Greer*.

Specifically, in *Greer*, just as here, a jury convicted the defendant of being a felon

in possession of a firearm prior to the decision in *Rehaif*.   141 S. Ct. at 2097-98.

Just like here, the defendant argued that he was entitled to a new trial because the

district court failed to instruct the jury of the knowledge-of-status element.   *Id.*

The Court held that Greer was not entitled to relief on plain-error review for his

unpreserved *Rehaif* claim.   The Court rejected the argument that *Rehaif* errors are

"structural" and require vacatur in every case.   *Id.*   Rather, to prevail on plain-

error review, Greer was required to show a "reasonable probability" that he would

have been acquitted if the district court had correctly instructed the jury on the

mens rea element of the offense.   *Id.*   Greer failed to meet his burden because he

had multiple felony convictions and never argued that he would have presented

evidence at trial that he did not know he was a felon.   *Id.*   The Court made clear

that an appellate court conducting plain-error review of a *Rehaif* error may

examine "relevant and reliable information from the entire record—including

information contained in a pre-sentence report."   *Id.*

*Greer* disposes of the defendants' arguments regarding the *Rehaif*

47

knowledge-of-status element.   Def. Br. at 46-48.   Here, as in *Greer*, the

defendants had felony convictions where they were sentenced to more than a year

in prison.   ECF 523 (Wilson PSR) at ¶ 66 (indicating a 2013 conviction for

robbery with deadly weapon where he was sentenced to 5 years in prison, and

ultimately served more than 2 years after a parole violation); ECF 525 (Pulley

PSR) at ¶¶ 48-60 (indicating: (1) a 2008 conviction drug possession where he was

sentenced to and served 17 months in prison; (2) a 2008 conviction for 2nd degree

assault where he was sentenced to 1 year in prison; (3) a 2012 conviction for

attempted heroin distribution where he was sentenced to 1 year in prison).[4]   This

negates any ability of these defendants to claim error post-Greer.   *See United*

*States v. Caldwell*, 2021 U.S. App. LEXIS 23202 (4th Cir. Aug. 3, 2021) (rejecting

*Rehaif* claim because it was impossible for defendant to claim plain error post-

*Greer* where he previously spent years in prison).   Moreover, these defendants

never made any argument or showing that they did not know they were felons.   In

fact, far from contesting their knowledge of status, they both stipulated to the prior

---

[4] It should be noted that some of these sentences were imposed and then a portion of the prison time was suspended in lieu of probation.   However, because 922(g) looks at crime punish*able* by more than a year, and not the actual punishment received, the fact that his sentence was in excess of year in some instances should be of no moment.

48

conviction element at trial.   JA 3033-34.   Here, as in *Greer*, this Court should find that the defendants are not entitled to plain-error relief.

## VII.   Ample Evidence Supported Wilson's Conviction Under § 924(c)

Wilson next challenges the sufficiency of the evidence to support his conviction for using a firearm in furtherance of drug trafficking.   Def. Br. at 49-51.   Under the case law of this Circuit, more than ample evidence was admitted.

Count Seven of the superseding indictment charged Wilson with possession of a firearm on January 10, 2017 in furtherance of the drug conspiracy charged in Count Three.   JA 98.   These charges stemmed from a search warrant that was executed on January 10, 2017 at 625 N. Augusta Avenue in Baltimore.   JA 2365-78.   During the execution of the search, agents recovered 75 vials of suspected cocaine and a firearm from the upstairs closet.   JA 2372.   The firearm was loaded. JA 2373.   In another room, they recovered approximately $12,000 in cash.   JA 2370.   When Wilson was interviewed by law enforcement on February 2, 2017, he admitted to knowingly possessing the recovered items.   JA 2434-37 (Wilson stating, "That was my drugs, my money.").   Wilson stated during the interview that he obtained the gun because the house "had gotten shot up" previously.   JA 2474-75.   The government confirmed that on December 20, 2016, several weeks before the warrant was executed, law enforcement had investigated and written a

49

report about someone shooting at the house.   JA 2475.   The government also

presented evidence that Jamar Hinton, a/k/a "Guerilla Mal," had used the

recovered firearm the previous day to murder Chris Pennington, a/k/a "Magic," at

an auto repair store on January 9, 2017.   JA 2109-30.   Ballistic tests established

that two bullets recovered from the scene were fired from the gun recovered at 625

N. Augusta Avenue.   That murder was shown to be related to the TTG drug

conspiracy**.**

## A.   Standard Of Review

When a defendant challenges the sufficiency of the evidence, this Court

"must sustain the fact finder's verdict if 'any rational trier of fact could have found

the essential elements of the crime beyond a reasonable doubt.'"   *United States v.*

*Lomax*, 293 F.3d 701, 705 (4th Cir. 2002) (citation omitted).   Whether the

requisite nexus between the firearms and the drug trafficking crime existed under §

924(c) "is ultimately a factual question," *id.*, subject to the clearly erroneous

standard.   *United States v. Moore*, 769 F.3d 264, 269 (4th Cir. 2014).

## B.    More Than Sufficient Evidence Supported Wilson's § 924(c) Conviction

In order to prove a violation of 18 U.S.C. § 924(c), the government must

establish the following elements:   (1) the defendant used or carried a firearm; (2)

50

during and in relation to a drug trafficking crime or a crime of violence. *United States v. Strayhorn*, 743 F.3d 917, 922 (4th Cir. 2014). For a jury "to conclude that possession of [a] firearm[] was in furtherance of drug trafficking," it must find that "there exists a sufficiently close nexus between the firearm[] and the drugs." *Moore*, 769 F.3d at 270 (internal quotation marks omitted). Among the factors relevant to this inquiry are the "accessibility of the firearm, the type of weapon, . . . whether the gun is loaded, [and] proximity to drugs or drug profits." *United States v. Howard*, 773 F.3d 519, 527 (4th Cir. 2014) (internal quotation marks omitted).

In *Howard*, officers found a loaded pistol with a round in the chamber and ammunition in the living room of Howard's residence, and, in the adjoining den, officers found a working police scanner and plastic vial caps. *Id.* On these facts, this Court held that "the theory that the presence of the firearm served to protect Howard from a potential theft of his drugs or profits is nevertheless a plausible one." *Id.* Similarly, in *United States v. King*, this Court found sufficient evidence where the firearms and thus uniquely suited for drug transactions, the defendant knew he was a felon prohibited from carrying a gun, and the firearms and the drugs were found in the same room. 628 F.3d 693, 710 (4th Cir. 2011). In *United States v. Jeffers*, this Court found sufficient evidence to uphold a §

51

924(c) conviction where the evidence showed that the defendant possessed various firearms at different points during the time he participated in the drug conspiracy and also showed that the defendant was willing to use a firearm in self-defense should it become necessary.   570 F.3d 557, 565-66 (4th Cir. 2009).

Here, the government adduced ample evidence that the gun recovered from Wilson's residence was used in furtherance of drug trafficking.   Specifically, the government demonstrated ample evidence that TTG members used firearms to settle scores, maintain drug territory, and kill potential informants who could expose the group.   For example, on March 2, 2015, TTG members killed Marquez Jones in retaliation after it was alleged Jones robbed another TTG member of drugs and/or proceeds.   JA 1797-1809; JA 2731-32.   Then, in July 2015, TTG committed a triple murder-for-hire at the behest of a member of YGG, which was one way the group raised money to further their enterprise.   JA 1642-60; JA 2734-35.   Similarly, in May 2016, Sivells and Barronette observed Antonio Addison and Andrew Johnson together in a vehicle; Sivells stated that they needed to kill Addison because he was associating with Johnson who was believed to be an informant; and Addison was later killed.   JA 3760.   In this way, the government showed TTG was using guns to further and protect its enterprise.   A rational jury could very well have concluded that Wilson maintained the gun in his residence so

52

it could be ready and available to him to carry out TTG business.   This alone is

enough under the highly-deferential standard of review that applies here.   *Jeffers*,

570 F.3d at 565-66 (possession of guns at various points in the conspiracy

sufficient to show nexus for 924(c) charge).   But there was more.   The fact that

the gun was in the same room as the drugs, and in close proximity to a large sum of

money, is also sufficient to show the nexus.   *Howard*, 773 F.3d at 527.

Additionally, the gun was loaded, JA 2373, and was the type of gun that could

facilitate drug trafficking, to wit, a Smith & Wesson .40 caliber pistol, JA 99,

which are also significant towards establishing a 924(c) nexus.   *Id.*   Further,

ballistics testing showed this gun was used in the murder of Chris Pennington.   JA

2109-30.   There was testimony that Pennington was involved in drug-trafficking,

JA 1967, and that Pennington was asking for information about defendant Pulley's

whereabouts, JA 1972, and that Pulley offered money to have Pennington killed,

JA 1973.   This is more than sufficient to establish that the gun found in Wilson's

house and used in the Pennington murder was related to, and in furtherance of,

TTG's enterprise.   Finally, even Wilson's explanation that he purchased the gun

after the house was shot up, *see* JA 2474-75, supports the jury's finding:   a

rational jury could have concluded that the residence was shot up by a rival drug

dealer, and Wilson purchased the firearm to protect himself, his drugs, and the

drug proceeds should the rival ever return.   And while the defendant attempts here to proffer alternative, non-drug-related explanation for his possession of the gun, Def. Br. 51, these arguments are irrelevant.   The jury was free to reject those arguments, and did reject them in finding the defendant guilty.   *See Lomax*, 293 F.3d at 706 (affirming 924(c) conviction because fact-finder was free to reject to defendant's proffers explanation).   In sum, more than ample evidence was adduced to show the requisite nexus between the gun and drug trafficking and TTG's enterprise.

## VIII. The District Court Properly Admitted The Grand Jury Testimony Of Of Markee Brown

Defendant Harrison brings the next challenge, this time to the admission of testimonial evidence from Markee Brown who was murdered by TTG to prevent him from testifying against Harrison on state robbery charges.   Def. Br. at 52. This claim fails, and alternatively, any error was harmless.

The second superseding indictment alleged that on December 28, 2015, defendant Harrison entered a residence near the 1900 block of Baker Street, Baltimore, Maryland, brandished a firearm, and robbed Dominique Harris and Markee Brown of drugs and money.   JA 741.   Shortly thereafter, Harrison murdered Harris in the area of 1900 Baker Street, Baltimore, Maryland.   *Id.*

54

Harrison was later charged with robbery, and Brown identified Harrison as the perpetrator.   Then, on April 16, 2016, Barronette and others murdered Brown near the intersection of Dumbarton Avenue and Wilsby Avenue, Baltimore, Maryland. JA 742.

At trial, the government adduced evidence about the murder of Harris, and the murder of Brown, and Harrison's involvement.   Specifically, the government put on evidence that:

(1) an eyewitness saw multiple shooters shoot Dominique Harris on December 28, 2015, and then one shooter stood over Harris and fired into his head, JA 2736;

(2) law enforcement recovered a .40 caliber shell casing from scene of Harris's murder which matched another shell casing retrieved from the scene of the murder of David Moore that occurred on November 8, 2015,[5] JA 2736;

(3) law enforcement also recovered a 9 mm shell casing from the scene of Harris's murder which matched another shell casing retrieved from the scene of the triple murder of Lamont Randall, Gerald Thompson, and Jacqueline Parker, JA 2460;

---

[5] This murder was also charged as an overt act committed by TTG.   JA 741. However, the jury did not find Barronette responsible for it.   JA 3393.

55

(4) after chasing Broughton on January 22, 2016, law enforcement recovered a 9mm SCCY handgun that ballistics testing matched to the shell casings found at the scene of the murder of Dominique Harris, JA 2460;

(5) law enforcement had signed up Markee Brown as a paid informant in April 2016, JA 2451-52;

(6) law enforcement arrested Harrison on April 11, 2016 and read him the statement of probable cause that supported the state robbery charges related to the robbery of Brown, JA 1614, 2358;

(7) Brown testified in the federal grand jury on April 13, 2016, JA 2452;

(8) a medical examiner performed the autopsy on Harris and confirmed his killing was ruled a homicide by gunshot, JA 2332-39; and

(9) law enforcement intercepted calls between Wilson and Sivells on January 2 and 9, 2017, in which they discussed how "Stinky," which was code for "Binkie," the nickname of Harrison, had been picked up for questioning by law enforcement, and they were concerned it was about "Guns' old man," JA 3020, 3309-10, 3316-17, referring to Dominique Harris, whose nickname was "Guns" or "Shotgun."

In addition to this evidence, the government also introduced: (1) the testimony of a detective who interviewed Brown on February 23, 2016, JA 2357;

56

(2) the testimony of a detective who conducted a photo array for Markee Brown on February 23, 2016 in which Brown identified "Binkie" as the one who robbed him, JA 2401-2403; (3) an audiotape of the federal grand jury testimony given by Brown, JA 2404-06. In this testimony, Brown related that "Binky" robbed him and Harris on December 28, 2015, and then later returned and killed Harris. JA 3378-3390. It is these latter pieces of evidence from Brown that Harrison challenges here on appeal.

As to the admission of the Brown testimony, the parties filed briefs on the issue, ECF 389, and the court heard extensive argument on the issue, JA 1110-20; JA 1918-38. Ultimately, the court found that it was admissible under Rule 804(b)(6), the forfeiture by wrongdoing exception to the hearsay rule. The court specifically held it was admissible based on the following facts: (1) the events of December 28th of 2015, when Brown and Harris were robbed and Harris was subsequently shot and killed; (2) the statement of probable cause issued on April 7, 2016 in which Harrison is accused of robbing a "black male victim;" (3) the recorded interview of April 11, 2016 in which Harrison is read the statement of probable cause outlining the robbery charge against him; (4) Brown was murdered just a week later on April 17, 2016; (5) on the day of the murder, Rias Barnes spoke to Jasmine Baldwin, who was identified as a girlfriend of Montana

57

Barronette and that same person, Barnes, was in contact with Brown's phone on the day of his murder; (6) on April 19, 2016, Brown's body was discovered and found to be burned; and (7) that there was a plethora of evidence adduced in the case showing TTG members had committed acts of violence against persons believed to be cooperators. JA 1936-37. In addition to these facts, the court also relied on the grand jury testimony of Guy Coffey, who was a government cooperator who was murdered. The court relied on Coffey's statements that: (1) Barronette said that "Binkie," which is the nickname of Harrison, was "coming home;" and (2) Brown was killed and set on fire afterwards and that Floyd burned his foot in the process of this. JA 1937.

Even though the jury found that Harrison murdered Brown and made him unavailable for trial, Harrison now challenges the admission of evidence from Brown. Def. Br. at 52-57. As detailed below, these claims fail.

### A.  Standard of Review

A district court's evidentiary rulings are reviewed for abuse of discretion, and the court's legal conclusions regarding constitutional claims are review de novo. *United States v. Dinkins*, 691 F.3d 358, 386 (4th Cir. 2012)

### B.  The District Court Properly Admitted The Brown Evidence

The Sixth Amendment provides that "[i]n all criminal prosecutions, the

58

accused shall enjoy the right . . . to be confronted with the witnesses against him."

However, common law provided an exception to the Confrontation Clause which

recognized that a defendant cannot profit from his own wrongdoing. *Giles v.*

*California*, 554 U.S. 353, 359-61 (2008); *Davis v. Washington*, 547 U.S. 813, 833

(2006). In other words, a defendant forfeits his right to object on confrontation

and hearsay grounds if he caused or acquiesced in the wrongdoing which made the

witness unavailable. *Id.* The Federal Rules of Evidence codified this as an

exception to the hearsay rules, providing that the hearsay rules do not exclude "[a]

statement offered against a party that wrongfully caused — or acquiesced in

wrongfully causing — the declarant's unavailability as a witness, and did so

intending that result." Fed. R. Evid. 804(b)(6).

In order for the exception to apply, the "trial court must find, by a

preponderance of the evidence, that '(1) the defendant engaged or acquiesced in

wrongdoing (2) that was intended to render the declarant unavailable as a witness

and (3) that did, in fact, render the declarant unavailable as a witness.'" *Dinkins*,

691 F.3d at 383 (citation omitted).

*Dinkins* is particularly instructive here. In *Dinkins*, the defendants were

members of a Baltimore street gang named "Special." Dinkins and other

members of the conspiracy knew that Dowery was an informant and the gang was

59

known to target government informants.   Prior to his incarceration, Dinkins

attempted to kill Dowery and expressed an interest in "finishing the job."

Unindicted members of the conspiracy later killed Dowery while Dinkins was

incarcerated.   While Dinkins was incarcerated at the time of his murder and had

no active part in the murder, the court concluded "that Dowery's . . . murder was a

natural consequence of the ongoing conspiracy."   *Id.*; *see also United States v.

Rivera*, 292 F. Supp. 2d 827, 837 (E.D. Va. 2003) ("[t]hese facts collectively point

persuasively to the conclusion (1) that Paz's murder was committed within the

scope of and in furtherance of a conspiracy in which Rivera participated and (2)

that this murder was reasonably foreseeable to Rivera").

Here, the district court's ruling was correct and should be affirmed because

there was more than sufficient evidence demonstrating that members of TTG

murdered Brown to prevent him from identifying and testifying against Harrison.

As the court observed, killing witnesses and cooperators was shown to be the

modus operandi of TTG.   JA 1936-37.   Further, the timeline showed that

Harrison was made aware of the robbery charges, and shortly thereafter Brown was

killed.   The court properly found this timeline gave a reasonable inference of

causality.   *Id.*   Additionally, there was the corroborative wiretap call in which

Wilson and Sivells discussed how Harrison was on defense and concerned about

60

"Guns' old man."   Finally, testimony of Coffey indicated expressly that

Barronette said that Harrison was "coming home," from which a reasonable

inference can be made that Barronette knew that by eliminating Brown, there

would be no witness to convict Harrison.   The Coffey testimony further indicated

that TTG members killed Brown and then burned his body, and that one member

burned himself in the process.[6]   This was more than enough, on a preponderance

of the evidence standard, to show that the forfeiture by wrong-doing exception

applied.

And nothing in the opening brief demonstrates otherwise.   The defendant

makes no argument as to the second and third prongs of the test in *Dinkins*; rather,

the principal arguments seems to concern whether sufficient evidence was

presented that Harrison ordered the murder himself.   Def. Br. at 57.   But that is

not the standard.   The government does not have to show that the defendant

directly participated in the witness' murder.   The forfeiture-by-wrongdoing

exception to the Confrontation Clause applies with equal force if co-conspirator

makes the witness unavailable and those acts are reasonably foreseeable, and in

---

[6] Harrison makes no challenge in the opening brief to the court's consideration of
the Coffey testimony in ruling on this motion in limine. Nor could he.   The
Federal Rules of Evidence do not restrict the kind of evidence a court can hear in
deciding a preliminary matter.   Fed. R. Evid. 104(a).

61

furtherance of the conspiracy.   *United States v. Carson*, 455 F.3d 336, 364 (D.C.

Cir. 2006) (citing *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946)).   As

the Seventh Circuit explained, "[w]ithout a rule of coconspirator waiver, the

majority of the members of a conspiracy could benefit from a few members

engaging in misconduct.   Such a result is at odds with the waiver-by-misconduct

doctrine's equitable underpinnings."   *United States v. Thompson*, 286 F.3d 950,

963-64 (7th Cir. 2002).   Indeed, just as here, in *Dinkins*, the murder was carried

out by a co-conspirator while the defendant was incarcerated.   And the evidence

here is more than sufficient to show that TTG members carried out this murder n

service of Harrison and the enterprise.   Nothing more was required.

As this Court noted in *Dinkins*, "the purpose of the forfeiture-by-wrongdoing

exception is to prevent 'abhorrent behavior which strikes at the heart of the system

of justice itself.'"   *Id.* at 383.   Harrison did just that here.   He had Brown

murdered to prevent him from testifying against him.   He should not be able to

profit from that wrongdoing.   The evidence was properly admitted.

Alternatively, even if there were some error in the admission of the

evidence, it was harmless.   As detailed above, the government adduced ample

evidence of Harrison's involvement in the Brown murder that was wholly separate

from the evidence supplied directly by Brown's statements.   Moreover, the Brown

murder was not an overt act that the jury was charged with finding as to Harrison.

JA 3396.   And while the Harris murder was one of the overt acts found by the jury

as to Harrison, the jury found two others, the murders of Brian Chase and Lamont

Randall, and the finding of two overt acts was more than was required.   *United*

*States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012) (holding that "a defendant

can conspire to violate RICO and violate § 1962(d) without 'himself commit[ing]

or agree[ing] to commit the two or more' acts of racketeering activity") (citation

omitted).   The Brown testimony thus was only a small slice of the evidence as to

the Harris murder, and the Harris murder was not necessary to the conviction on

Count One.   This is the very definition of harmlessness.   Accordingly, even if

there were some error on the court's ruling, this Court should still affirm.

## IX. The District Court Properly Exercised Its Discretion By Denying Defendants' Motion For Mistrial Because Bond's Testimony Caused No Prejudice

Defendants Barronette and Pulley next argue that the district court abused its

discretion by denying a motion for mistrial after a witness in the government's

case-in-chief, on cross-examination, indicated he saw a news report that Barronette

was the "number one gun puller in Baltimore."   Def. Br. at 58-59 (citing JA

2403.30).   The court instructed the jury to ignore that comment and the trial

moved on.   JA 2403.30.   As detailed below, the district court properly exercised

63

its discretion. And alternatively, the challenge fails because any error was invited by defense counsel's line of questioning on cross-examination.

### A. Standard of Review

"Denial of a defendant's motion for a mistrial is within the sound discretion of the district court and will be disturbed only under the most extraordinary circumstances." *United States v. Dolorius*, 107 F.3d 248, 257 (4th Cir. 1997).

### B. The Witness's Statement Was Not Prejudicial

This Court recently addressed a claim for a mistrial arising from a witness's statement at trial. *United States v. Taylor*, 942 F.3d 205, 221 (4th Cir. 2019). In that case, a witness made an emotional outburst expressing his disgust after being robbed by the rogue police officers who were on trial. Just as here, the court issued a limiting instruction to the jury. In affirming the denial of a motion for mistrial, this Court recognized that "on a courtroom issue such as this, the district court is best positioned to assess whether a mistrial is warranted or whether other means exist to address the issue adequately." *Id.* A mistrial is only required if the evidence "would prejudice the defendant, and there is an 'overwhelming probability' that the jury would be unable to heed a cautionary instruction." *Id.* This Court cautioned that a mistrial is a "drastic step" and should only be considered in "extraordinary" circumstances. *Id.*

64

Similarly, in *United States v. Wallace*, a witness referenced a domestic incident involving the defendant in which he "choked" his wife and "slammed her into a van."   515 F.3d 327, 330 (4th Cir. 2008).   This Court held there was no prejudice warranting a mistrial, particularly where the court issued a curative instruction, because it was clear the jury could make an individual guilt determination by following the court's cautionary instructions.   *Id.*

That is precisely the case here.   As soon as Boyd testified and made the remark about what he heard on television, the court stopped the witness from testifying further and issued a curative instruction that asked the jury to ignore the comment.   JA 2403.30.   At the conclusion of the presentation of evidence, the district court again instructed the jury to disregard stricken evidence.   JA 2619. Neither defendant cites anything to support the proposition that the jury did not follow these instructions.   Moreover, it must be kept in mind that the government's proof came from a number of witnesses spanning 25 days of trial. It cannot be that one single outburst from one single witness in one single passage of his testimony was sufficient to improperly influence the jury.

Moreover, as detailed above, the United States presented evidence from a variety of difference sources that allowed the jury, properly instructed, to make an individualized guilt determination as to both Barronette and Pulley.   The

65

government introduced wiretap evidence, eyewitness accounts, cooperator testimony, social media evidence, expert testimony, photographic evidence, and much more.   Based on this mountain of evidence that had nothing to do with Boyd, no prejudice exists from Boyd's utterance.   Indeed, even in the narrow context of Boyd's testimony itself, he testified that Pulley told him that he (Pulley) paid Barronette $10,000 to kill a man.   JA 2403.5.   In this way, the direct evidence presented by Boyd was infinitely more damning that any news report.   It cannot be said that any unfair prejudice therefore inured based on this utterance by Boyd on cross which was immediately cured by the district court.   Therefore, the district court did not abuse its discretion in denying the defendants' motion for a mistrial.

Furthermore, this challenge fails for another reason:   any error was invited. Specifically, defense counsel opened up this line of questioning about news reports.   Defense asked if Boyd had read about Barronette in newspapers.   JA 2403.28.   After Boyd responded negatively, defense counsel pushed further and asked about the television news.   *Id.*   After several questions about what Boyd heard about Barronette on the news, the witness gave the response that the defense now challenges.   Any error was invited error by asking questions during cross-examination that elicited the disputed response.   *See United States v. Neal*, 78

66

F.3d 901, 904 (4th Cir. 1996) (holding that inflammatory testimony that defendant was a high-level "kingpin" drug dealer elicited by defense counsel from government witness during cross-examination was invited error).

## X.    More Than Sufficient Evidence Established The Drug Weight Found By The Jury

The defendants next attempt to challenge the jury's finding that more than one kilogram of heroin was trafficked in this conspiracy and was reasonably foreseeable to the defendants.   Def. Br. 62-63.   This claim also fails because there was ample evidence that, over the seven-year span of this conspiracy, more than a kilogram of heroin was involved.

### A.  Standard of Review

As detailed above, a defendant challenging the sufficiency of the evidence to support his conviction bears a "heavy burden."   *Beidler*, 110 F.3d at 1067.   All evidence and reasonable inferences must be construed in favor of the government, and the jury's finding must be affirmed as long as "any rational trier of fact" could have made the finding beyond a reasonable doubt.   *Robinson*, 855 F.3d at 268.

### B.  Ample Evidence Supported The Drug Weight Findings

In light of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the government must allege in the indictment, and the jury must find beyond a reasonable doubt,

67

any threshold drug weights that trigger enhanced mandatory minimum penalties in 21 § 841(b)(1)(A). *United States v. Promise*, 255 F.3d 150, 152 (4th Cir. 2001) (en banc). To arrive at a drug weight finding, a jury may rely on circumstantial evidence. *See United States v. Burgos*, 94 F.3d 849, 858 (4th Cir. 1996). Also, it is perfectly proper to extrapolate a total drug weight from specific transactions and seizures. *United States v. Hickman*, 626 F.3d 756, 769 (4th Cir. 2010)

Here, the indictment alleged a seven-year conspiracy, lasting from 2010 through January 2017. JA 749. At trial, the government put on ample evidence of drug-dealing activities by the defendants during this period. For example, the government established numerous controlled buys of heroin, totaling more than 180 grams. On November 24th, 2015, cooperating source Guy Coffey made a controlled call to Barronette to order up 10 grams of heroin, which he subsequently supplied. Tr. Testimony Det. Delorenzo from September 26, 2018 at 24. On January 7, 2016, law enforcement used Coffey and another confidential source, Courtney Dunn, to buy a total of 50 grams of heroin from Barronette. *Id.* at 36-45. In addition, Sterling Crowder made controlled purchases. On May 4, 2016, Crowder, at the direction of law enforcement, purchased 104 grams of heroin. JA 1153. He set up the buy through Barronette over the phone but he ended up meeting with Floyd and Barronnette. JA 1158. On August 4 and 11, 2016, law

68

enforcement officers used Ronnie Johnson to conduct controlled buys totaling 25 grams of heroin directly from Sivells.   JA 1473.

In addition to these controlled buys, there was testimony from drug customers about their usual purchases.   For example, Sterling Crowder estimated that during a two-year period, he bought at least 75 grams of heroin from Barronette.   JA 1147.   Davon Robinson indicated he purchased 50 to 75 grams of heroin eight to ten times from Pulley.   Tr. Testimony of Davon Robinson, October 4, 2018 at 48-49.   Additionally, one cooperating source had a conversation with Sivells on September 1, 2016 in Sivells stated he made $6,000 in drug sales in one week and that Barronette made $50,000 in a two-week period.   JA 3761.   Given that a gram of heroin was established to sell for $90, this meant Sivells was selling at least 60 grams a week and Barronette was moving 277 grams a week.   There was also an admission by Floyd that he made about $500 in drug sales per day, which amounts to more than 5 grams a day.   JA 1517.   There was also a wiretap call in which Sivells admitted he did "two ounces" everyday.   JA 3073.

Finally, the government introduced wiretap calls in which drug customers were ordering up various quantities of heroin.   JA 3037 (customers asking for "100"); JA 3071 (customer asking for a "half"); JA 3091 (customer asking for some "brother"); JA 3096 ("I need a 14 and a 7.").

69

Based on the foregoing, there was more than sufficient evidence to establish the drug weight found by the jury.   The controlled buys alone, which took place over an eight-month period of a seven-year long conspiracy, establish 180 grams or close to 20% of the total weight found by the jury.   Similarly, the testimony of Robinson and Crowder establish another 450 grams even on their most conservative estimates.   The testimony about the amount of money made by Barronette, Sivells, and Floyd establishes their drug weights well exceed that found by the jury.   And the wiretap calls further confirm the large-scale volume of drug sales being done by this crew.   In this way, there was more than enough evidence on which the jury could have extrapolated to reach more than one kilogram. *Hickman*, 626 F.3d at 769.

## XI.    More Than Sufficient Evidence Showed That Sivells and Floyd Conspired to Murder Antonio Addison

Sivells and Floyd next challenge the jury's finding that they conspired to murder Antonio Addison.   Def. Br. at 63-65.   This challenge fails.

### A.   Standard of Review

As detailed As detailed above, a defendant challenging the sufficiency of the evidence to support his conviction bears a "heavy burden."   *Beidler*, 110 F.3d at 1067.   All evidence and reasonable inferences must be construed in favor of the

70

government, and the jury's finding must be affirmed as long as "any rational trier of fact" could have made the finding beyond a reasonable doubt. *Robinson*, 855 F.3d at 268.

**B.      Ample Evidence Supported The Jury's Finding Regarding Addison's Murder**

Beginning in early 2016, members of TTG, including Barronette and Sivells, were involved in an escalating violent feud with Cedric Catchings, Andrew Johnson, Amos Johnson, Brandon Bazemore, and Antonio Addison, which resulted in the murder of Addison, aka "Thug." JA 3760. The feud started over the belief that Andrew Johnson had cooperated with law enforcement. *Id.* Wiretap calls then captured the co-conspirators doing surveillance on their targets and ultimately killing them. For example, on May 3, 2016, Floyd tells Sivells that he is watching Catchings walk down the street, and they discuss how Catchings was teaming up with Addison and others who were believed to be informants. *See* JA 3172-74. Then, on May 25, 2016, an individual fired shots into a car occupied by Bazemore and Johnson; after the hit, law enforcement intercepted a call involving Sivells in which he asked the shooter whether he had "hit" Bazemore, who sustained non-life-threatening injuries. JA 3761. Then, that same day, Sivells and Barronette observed Antonio Addison and Andrew Johnson together in a vehicle. *Id.*

71

`

Sivells stated that they needed to kill Addison because he was associating with Johnson who was believed to be an informant. *Id.* Sivells and Barronette responded by retrieving firearms and traveling to Johnson's grandmother's residence on N. Carey Street. *Id.* Upon locating Addison there, they shot and killed Addison on the front steps. *Id.* The government established these facts in part through the testimony of Tyree Paige. JA 1685-1710.

Additionally, the information was corroborated in part by the wiretap calls indicating the TTG members discussing where their targets were at and what they were doing. For example, there was a call on April 11, 2016 where Floyd tells Barronette that his "boy" was sitting in a car and Floyd was watching him. JA 3136. Then, on April 12, Sivells tells Barronette that "Spaghetti Boy" was headed over to his grandmother's house. JA 3137. On April 14, there was another call between Floyd and Barronette in which Floyd reports that "Thug" and "Ced" were there by Addison's grandmother's house. JA 3140. And there were four calls on May 3 between Floyd and Sivells in which Floyd continues to surveil Ced. JA 3172-76.

Additionally, the government put on that a cellular phone associated with Sivells, (443) 254-6202, was in the vicinity of 900 North Calhoun Street on May 25, 2016 between 9:09 and 10:38 p.m. when the murder took place. JA 2138-67.

72

Further, Boyd testified that Barronette bragged to him about killing a person at their grandmother's house, and how he (Barronette) thought it was funny that the decedent was killed there and landed face down in dog feces during the killing. JA 2403.10.   These facts described the murder of Addison.

Finally, the government showed that 9 mm shell casings were found on the scene, JA 1939.17, and as detailed above, 9 mm shell casings were found at other murders committed by this group.

These facts were more than enough.   Indeed, the testimony of a single uncorroborated witness may be sufficient to sustain a conviction.   *United States v. Wilson*, 115 F.3d 1185, 1190 (4th Cir. 1997).   In this way, the testimony of Paige alone would be enough.   But here, the government provided even more evidence, including the Boyd testimony, the GPS data, the wiretaps, and the evidence of other targeted killings by this group to snuff out potential cooperators and informants.   This Court should affirm.

## XII.   More Than Sufficient Evidence Supported The Jury's Finding That Broughton Conspired To Murder Someone In January 2016

Broughton next challenges the sufficiency of the evidence as to the jury's finding that he conspired to murder an unknown individual on January 22, 2016. Def. Br. at 73.   This challenge fails as well under the highly-deferential standard

73

of review that applies here.

The government principal evidence on this finding was a series of wiretap calls between Broughton, Sivells, and Barronette on January 22, 2016, between 6:50 pm and 7:00 pm.   The first calls involved Broughton reporting to Barronette that a member of TTG ("Mike") had been robbed.   JA 924, 3041-51, 3759. During the conversation, Barronette was riding in a vehicle with Sivells and Broughton was on the street looking to murder the culprits.   *Id.*   On several occasions, Barronette and Broughton called out the location of the individuals.   *Id.* For example:

> LB: Where they went at? They went straight down?
>
> MB: I don't know. Ya'll just told me they ya'll, they walked down Mosher
>
> LB: They went straight down Mosher
>
> UM2: They went Mosher towards Appleton yo.
>
> LB: Going towards Appleton.
>
> MB: Where the fuck ya at?
>
> LB: Stay wit em, come on.
>
> MB: Stay wit em. Stay with their ass.

*Id.*   At one point, Barronette stated that he wanted to obtain a firearm ("[a]bout to grab that other jimmy mack").   *Id.*   Later, Sivells commented that the individuals

74

walked past Broughton and he was supposed to kill them ("[w]hy fuck Marty let 'em go past him though. He froze? That's supposed to be his time to shine"). *Id.* They located the individuals entering a residence on Riggs Avenue and Barronette commented that he should have exited the vehicle and shot the individuals ("[t]hey going in a house with a gate. On Riggs and Appleton? You should have let me jumped out and pop one of their asses"). *Id.* Barronette then discussed the robbery with "Mike" and confirmed that the robbers stole "Mike's" cell phone, drug proceeds, and four "bags" of heroin ("I only sold like four bags so it was probably was like $40"). Barronette relayed the information to Sivells, who responded: "[t]hey took the what? He better go shoot that motha fucka up." *Id.* Ultimately, Barronette and Broughton did not shoot at the individuals because law enforcement moved into the area to disrupt the potential violence. The chase caused Barronette to crash his car in the snow, at which point he and Broughton ran. *Id.* Broughton discarded two firearms. *Id.* The next day, Barronette and Sivells discussed how the police chased them, and how Broughton discarded a gun that was later recovered. *Id.*

This was more than sufficient to support the jury's findings. The wiretap calls establish clearly Broughton's desire to kill these unnamed individuals who robbed Mike. The calls detail them following the group and deciphering which

75

house they entered.   The calls detail Barronette grabbing several guns (jimmy-macks) to do the job.   And then the calls corroborate that the plan was foiled when the police moved in.   And these calls were corroborated by the police seizure of the firearms and their detention of Broughton that night.   Based on these facts, the jury was well within its rights to find that Broughton conspired to commit murder on this occasion.

## XIII.   Sivells' Life Sentence Was Procedurally And Substantively Reasonable

Sivells next challenges the procedural and substantive reasonableness of his sentence.   Def. Br. at 75-77.   As detailed below, this Court should affirm.

### A.   Standard of Review

Post-*Booker*, this Court reviews the reasonableness of a sentence "under a deferential abuse-of-discretion standard."   *United States v. Cox*, 744 F.3d 305, 308 (4th Cir. 2014); *United States v. Diosdada Star*, 650 F.3d 359, 363 (4th Cir. 2011). Under *Gall v. United States*, 552 U.S. 38 (2007), sentences are reviewed first for "significant procedural error," such as "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence."   *Id*.   The district court "must adequately explain the chosen sentence to allow for meaningful appellate review and

76

to promote the perception of fair sentencing." *Id.* However, a district court is not required to 'robotically tick through' every § 3553(a) factor in a checklist fashion and the explanation for a sentence need not be elaborate or lengthy, but it must make an individualized assessment of the § 3553(a) factors tailored to the defendant." *United States v. White*, 850 F.3d 667, 676 (4th Cir.), *cert.* denied, 137 S. Ct. 2252, 198 L. Ed. 2d 687 (2017); *United States v. Hernandez*, 603 F.3d 267, 271 (4th Cir. 2010). Furthermore, when the district court imposes a within-Guidelines sentence, the district court may "'provide a less extensive, while still individualized, explanation.'" *United States v. Nesbitt*, 464 F. App'x 89, 91-92 (4th Cir. 2012) (unpublished) (quoting *United States v. Johnson*, 587 F.3d 625, 639 (4th Cir. 2009)).

Additionally, an individualized assessment requires "that district courts consider the defendant's nonfrivolous arguments for a downward departure, impose an individualized sentence based on the characteristics of the defendant and the facts of the case, and explain the sentence chosen." *United States v. Ross*, 912 F.3d 740, 744-45 (4th Cir. 2019). The individualized assessment "need not be elaborate or lengthy," as long as it provides "a rationale tailored to the particular case at hand and is adequate to permit meaningful appellate review." *United States v. Carter*, 564 F.3d 325, 330 (4th Cir. 2009). In fact, this Court has held that a district court adequately considers mitigation arguments by simply saying

77

"all right" in response.    *United States v. Gibbs*, 897 F.3d 199, 205 (4th Cir. 2018)

("The court's comments about Gibb's arguments, while not extensive, nonetheless

do enable us to 'effectively review the reasonableness of Gibb's sentence' with the

'assurances' that the court '*considered* any potentially meritorious arguments

raised by Gibbs with regard to his sentencing.'").    Moreover, a district court need

not consider frivolous arguments at all.    *See United States v. Slappy*, 872 F.3d

202, 207 (4th Cir. 2017).

If the reviewing court finds no significant procedural error, the next step is

to consider the substantive reasonableness of the sentence, using the abuse-of-

discretion standard.    "Substantive reasonableness requires the sentencing judge to

determine whether the sentence imposed satisfied the factors under 18 U.S.C.

§ 3553, taking into account the totality of the circumstances surrounding the

sentencing process."    *United States v. Mendoza-Mendoza*, 597 F.3d 212, 216 (4th

Cir. 2010) (citation omitted).

> **B.      There Was No Procedural Or Substantive Error In Sivells'
> Sentencing**

The jury convicted Sivells on all counts as charged.    JA 3393-99.    The jury

found he engaged in a RICO conspiracy with Barronette and others.    JA 3395.

As detailed above, this conspiracy was involved in numerous murders and large-

78

scale drug-trafficking.   The jury specifically found that Sivells conspired to murder Antonio Addison on May 25, 2016.   JA 3395.   The jury also held Sivells responsible for trafficking more than a kilogram of heroin, in addition to also trafficking marijuana and cocaine.   JA 3403.   He was also found guilty of substantive distribution counts.   JA 3410.   For this, the district court calculated the advisory sentencing guidelines range at offense level 43, criminal history category VI, for a range of life.   JA 3485.

The district court then listened to the parties' arguments and imposed a sentence of life imprisonment.   In explaining its sentence, the court started by indicating it had read the parties' sentencing memoranda.   JA 3517.   The court described what Sivells did as "the most serious offense possible" given that lives were lost.   JA 3518.   The court specifically found that Sivells murdered Addison. *Id.*   The court also found Sivells conspired to kill Cedric Catchings, and was only thwarted when law enforcement moved in.   JA 3519.   In reference to the defense mitigation arguments, the court did note that Sivells "had a very difficult and destructive childhood" and documented "neuropsychological issues."   JA 3520. But the court held that these mitigation arguments were "outweighed" by the violent offense conduct.   JA 3521.   For these reasons, in order to take into account the offense conduct, and to protect the public from further crimes, the

79

court held that "a sentence of life in prison is the necessary sentence in this case."

The court fully complied with all procedural requirements. The court properly calculated and considered the guidelines. The court read the sentencing memoranda. The court listened to the parties' argument. And then the court explained its ruling. The sentence was within the guidelines range. In that instance, less explanation is required. *Nesbitt*, 464 F. App'x at 91-92; *Johnson*, 587 F.3d at 639. Notwithstanding that a within-guidelines sentence does not normally require much explanation, the court provided one here. The court discussed the heinous crimes committed and the need to protect the public. Moreover, while Sivells chides the district court for only giving a "cursory" discussion of the defendant's claims about his poor childhood and psychological issues, Def. Br. at 78, this argument is not well-taken. The district court *did* provide a response to this mitigation argument. The court acknowledged what the defense was arguing, but held that those arguments were outweighed by the offense conduct. Nothing more was required.

Nor is the defense argument about substantive reasonableness well-taken. As the defendant admits, this Court has held that a within-guidelines sentence is presumptively reasonable. *United States v. White*, 850 F.3d 667, 674 (4th Cir. 2017). And here, Sivells committed truly chilling violence and did so with the

80

kind of "devil-may-care" facility that rightly deserved a life sentence. As the

court found, Sivells was involved in the Addison murder and the attempted murder

of Catchings. But more than just these findings, the wiretap calls put into focus

the kind of dangerousness associated with Sivells and his brother Barronette. As

government counsel noted, one of the quotes from Barronette was that, "We're no

longer hustling. We're hunting." JA 3490. This organization literally hunted

other human beings and then eliminated them with a geyser of bullets. People

who prey on others in this manner deserve a life sentence. Moreover, Sivells'

attitude towards killing is also noteworthy. In chiding Broughton for not shooting

when he had the chance on January 22, 2016, Sivells said that gunning those

people down was Broughton's "time to shine." JA 3490. These words portrayed

killing as something to be proud, something that burnishes one's reputation. That

comment is abhorrent. And it exposes the nature and circumstances of these

offenses, and the history and characteristics of this defendant. On these facts, the

life sentence was merited and certainly substantively reasonable.

## XIV.  The District Court Properly Sentenced Broughton

Broughton next challenges the district court's calculation of his advisory

guidelines range, specifically complaining about the district court's decision to apply

an enhancement under U.S.S.G. § 2D1.1(b)(2) because the defendant used violence,

81

made a credible threat of violence, or directed the use of violence.   Def. Br. at 80-82.   This challenge is meritless.

## A.   Standard of Review

A district court's factual findings regarding guidelines enhancements are reviewed for clear error.   *United States v. Slade*, 631 F.3d 185, 188 (4th Cir. 2011). In reviewing guidelines determinations, this Court affords "'great deference" to a district judge's credibility determinations and how the court may choose to weigh the evidence."   *United States v. Williamson*, 953 F.3d 264, 273 (4th Cir. 2020) (citation omitted).

## B.   The District Court Properly Sentenced Broughton

The United States Sentencing Guidelines impose a two-level increase to the defendant's base offense level if "the defendant used violence, made a credible threat to use violence, or directed the use of violence" during the course of the offense. U.S.S.G. § 2D1.1(b)(2).   Importantly, an actual injury need not occur; it is enough if the defendant merely directs violence to occur.   *See United States v. Atkinson*, 815 Fed. Appx. 704, 708 (4th Cir. 2020).

Here, as the district court noted, the trial featured evidence of a series of calls among the co-conspirators on January 22, 2016 in which they were trying to locate and kill some unnamed individuals.   The calls showed the defendants watched these

82

`

individuals, obtained firearms, and then went out hunting for these individuals. Broughton was an integral part of this scheme. He directed the group where to go. JA 3759 ("they down at Mosher [Street]). He also egged on the group. JA 3759 (Broughton stating, "stay with 'em"). But there was even more than that. Aside from the wiretap calls, law enforcement was dispatched; the defendants crashed their cars; and Broughton was chased, discarding one firearm in the process. This shows that he was the one carrying the guns that would have been used to kill the unnamed people if they had not been disrupted by police. As a result of all the evidence, the jury found beyond a reasonable doubt that Broughton conspired to murder people on January 22, 2016. JA 3341. That should end the matter; with that verdict, and affording proper deference to the district court, the guideline enhancement should apply.

And nothing in the defense brief demonstrates otherwise. While Broughton makes much of the fact that no harm came to the people the defendants were hunting, this is irrelevant. As this Court found, the enhancement can apply even where no injury occurs. *See Atkinson*, 815 Fed. Appx. At 708. Indeed, the plain language focuses on whether a defendant "directed" violence to occur, and here Broughton is actively his fellow gang members where their targets are at, and telling them where to go and to stay with them. Broughton was in possession of the two guns they are

83

going to use to do the job.   This is more than enough for this enhancement to apply, especially considering the jury verdict and the deferential standard of review.

Broughton is also wrong to contend that the PSR overstated his criminal history.   He principally takes issue with the fact that one of his convictions counts when he received a probation before judgment diversionary sentence.   Def. Br. at 83.   The problem with this argument is that this Court has routinely considered PBJs to be diversionary sentences that count for guidelines purposes.   *See United States v. Medina,* 718 F.3d 364, 368 (4th Cir. 2013) (PBJ counts as predicate conviction under USSG § 2L1.2); *United States v. Bagheri*, 999 F.2d 80, 83 (4th Cir. 1993). The defendant can hardly claim his criminal history was over-represented when the district court was simply following this Court's binding precedent to count the PBJ conviction.    Thus, there was no error in the criminal history determination. Moreover, a downward variance under U.S.S.G. § 4A1.3(b)(1) is entirely permissive; the district court "may" vary or it may not.   The defendant is wrong to suggest that the district court was somehow required to adjust the criminal history here.   There was simply no basis to do so; and even if there was, it would not be error for the court to decline.   And in this way, Broughton is wrong to suggest that the failure to exercise a discretionary variance can amount to the sentence becoming substantively unreasonable.   Def. Br. at 84.   That simply piles discretion upon

84

inference upon conjecture.   There was nothing substantively unreasonable about imposing a sentence within the properly determined guidelines range.   And given the offense conduct here, the sentence was appropriate.

Finally, while Broughton tries to muster a procedural reasonableness claim, this too fails.   Specifically, just like Sivells, Broughton acknowledges that the court addressed his mitigation arguments about his lead paint exposure and difficult childhood.   Def. Br. at 85.   However, Broughton chides the court for only addressing these arguments "briefly."   That is not the standard.   Procedural reasonableness is met where the court addresses the arguments and explains how the court weights them.   The district court did that here.   JA 3458.   Nothing more was required.   This Court should affirm.

## XV.   The District Court Properly Sentenced Floyd

Finally, Floyd raises several challenges to his sentence, including the imposition of a guidelines enhancement, his career offender status, and the reasonableness of the sentence.   Because these challenges fail, this Court should affirm.

First, while Floyd challenges the court's imposition of a four-level enhancement in his guidelines range pursuant to U.S.S.G. § 2A1.5(b)(1), Def. Br. at 86, this enhancement was proper.   This guideline provides that "[i]f the offense

85

involved the offer or the receipt of anything of pecuniary value for undertaking the murder, increase by 4 levels." U.S.S.G. § 2A1.5(b)(1). Here, as the PSR noted sometime in April 2016, members and associates of TTG believed that Cedric Catchings, aka "Ced," murdered a TTG associate, "Slow." JA 3685. DeAndre Smith, aka "Blue Black," also a TTG associate, responded by offering $10,000 to anyone who murdered Catchings. Id. Then, as detailed above, Floyd acted on the bounty, calling Barronette on April 14, 2016, and alerting him that Ced was located near Antonio Addison's grandmother's residence on N. Carey Street. *Id.* Barronette, Smith, and others then drove to Sandtown, retrieved firearms and met with co-defendant Brandon Wilson, Sivells and others. *Id.* All the while, Floyd continued to provide Sivells and Barronette with information concerning Catchings' location. Those individuals then departed Sandtown and drove toward Catchings last known location for the specific purpose of killing Catchings. Law enforcement officers, however, intervened and thwarted Barronette, Floyd, and others from killing Catchings. *Id.* The court adopted the PSR's findings. JA 3541; JA 3549 (court finding expressly that Floyd assisted with the Catchings attempted murder and that it had a "financial incentive" attached to it). This was more than enough for the court to impose the enhancement under § 2A1.5(b). And even then, the court indicated that it would impose the same sentence regardless of

the PSR enhancement issues. JA 3550. This provides another reason why this Court should affirm. *United States v. Savillon-Matute*, 636 F.3d 119, 123 (4th Cir. 2011) (any guidelines error is irrelevant if the court indicates it would have reasonably imposed the same sentence regardless the outcome of the guidelines disputes).

Second, while Floyd challenges his career offender designation, Def. Br. at 89, this challenge should also be rejected. Because the district court indicated it would impose the same sentence regardless of the guidelines, JA 3550, this challenge is irrelevant and should be summarily dismissed. *Savillon-Matute*, 636 F.3d at 123. In this way, while the defendant avers that his instant offenses of conviction, namely RICO conspiracy and drug conspiracy, are not proper career offender predicates under U.S.S.G. § 4B1.2, this Court need not reach the issue. Now, to be sure, the government notes that in *United States v. Simmons*, 999 F.3d 199 (4th Cir. 2021), this Court recently held that RICO conspiracy was not a "crime of violence" under the force clause in 18 U.S.C. § 924(c), which is similar to the force clause in the guidelines. While the Court in *Simmons* later granted panel rehearing and issued an amended opinion which declined to definitively weigh in on whether the RICO conspiracy statute was divisible, it nevertheless held that even an aggravated form of RICO conspiracy would not count as § 924(c)

87

predicate.   Further, as to the other conviction, drug conspiracy, this Court has held

that it does not count as a controlled substance offense under U.S.S.G. § 4B1.2.

*United States v. Norman*, 935 F.3d 232 (4th Cir. 2019).   Notwithstanding these

recent precedents, however, as discussed above, this Court need not reach these

thorny issues in this case because the district court indicated it would enter the

same sentence regardless the career offender designation.   As such, this Court

should affirm.   *See United States v. Carney*, 761 Fed. Appx. 150 (4th Cir. 2019)

(rejecting challenge to career offender designation because district court made

clear it would impose same sentence regardless); *accord United States v. Shrader*,

675 F.3d 300, 315 (4th Cir. 2012) ("We . . . need not address the propriety of the

ACCA enhancement, because an upward variance or departure in this case would

produce exactly the same result and because the transcript makes clear that the

sentence herein, irrespective of any ACCA enhancement, plainly effectuated the

trial court's sentencing intent.").

Finally, while Floyd raises claims regarding procedural and substantive

reasonableness, these claims fail as well.   The court gave an extended explanation

of its rationale.   JA 3548-50.   This included a discussion of the facts about the

gang's activities, as well an individualized assessment of Floyd's specific conduct.

The court also considered Floyd's prior criminal record.   The defense has not

88

identified any mitigation argument that the court did not consider. The sentencing

here was both procedurally and substantively proper. This Court should affirm.

## CONCLUSION

For the reasons stated, this Court should affirm the defendant's convictions

and sentences.

Respectfully submitted,

Jonathan F. Lenzner
Acting United States Attorney


            /s/
Jason D. Medinger
Assistant United States Attorney

`

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

The government respectfully submits that oral argument is not necessary

given that the issues raised are not novel and are subject to this Court's precedents.

90

## CERTIFICATE OF COMPLIANCE

1.      This brief has been prepared using:

**Microsoft Word, Times New Roman, 14 Point**

2.      EXCLUSIVE of the corporate disclosure statement; table of contents; table

of citations; statement with respect to oral argument; any addendum

containing statutes, rules, or regulations, and the certificate of service, the

brief contains 19,657 words.

I understand that a material misrepresentation can result in the Court's

striking the brief and imposing sanctions.    If the Court so directs, I will provide an

electronic version of the brief and/or a copy of the word or line print-out.

_____/s/_____
Jason D. Medinger
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 17, 2021, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF System, which will send

notice of such filing to the following registered CM/ECF user:

Michael E. Lawlor
BRENNAN MCKENNA & LAWLOR
Suite 700
6305 Ivy Lane
Greenbelt, MD 20770

Christopher Carlos Nieto
LAW OFFICE OF CHRISTOPHER C. NIETO, LLC
Suite 1301
1 North Charles Street
Baltimore, MD 21201

Jenifer Wicks
BLIND JUSTICE LEGAL SERVICES CORPORATION
Suite 5419
6909 Laurel Avenue
Takoma Park, MD 209

Alfred Guillaume, III, Esq.
LAW OFFICES OF ALFRED GUILLAUME III
Suite 700
6305 Ivy Lane
Greenbelt, MD 20770

Stuart A. Berman, Esq.
LERCH, EARLY & BREWER, CHARTERED
Suite 460
7600 Wisconsin Avenue
Bethesda, MD 20814-0000

Richard Bruce Bardos
SCHULMAN, HERSHFIELD & GILDEN, P. A.
Suite 904
1 East Pratt Street
Baltimore, MD 21202

Gerald Chester Ruter
LAW OFFICES OF GERALD C. RUTER, P.C.
Suite O
9411 Philadelphia Road
Baltimore, MD 21237

Steven M. Klepper, Esq.
KRAMON & GRAHAM, PA
Commerce Place
Suite 2600
1 South Street
Baltimore, MD 21202-0000

__/s/_____
Jason D. Medinger
Assistant United States Attorney